UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE
-----------------------------------------------------------

GORDON MACRAE,

PETITIONER

– AGAINST –

RICHARD M. GERRY, WARDEN,
NEW HAMPSHIRE STATE PRISON

RESPONDENT


-----------------------------------------------------------
MEMORANDUM OF LAW IN SUPPORT
OF PETITION FOR A WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY
PURSUANT TO 28 USC § 2254
-----------------------------------------------------------

ROBERT ROSENTHAL
COUNSELOR AT LAW
523 EAST 14TH STREET, SUITE 8D
NEW YORK, NEW YORK 10009
(212) 353-3752


CATHY J. GREEN, ESQ., BAR #995
GREEN & UTTER, P.A.
764 CHESTNUT STREET
MANCHESTER, NH 03104
(603) 669-8446


ATTORNEYS FOR PETITIONER GORDON MACRAE

Dated: January 23, 2014

## TABLE OF CONTENTS

TABLE OF CASES AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

TABLE OF CONTENTS OF APPENDIX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

THE FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    1.      The Context In Which Grover Created His Stories. . . . . . . . . . . . . . . . . . . . . . 3

    2.      The Accuser: Tom Grover – Liar, Addict and Criminal. . . . . . . . . . . . . . . . . . 5

            Grover the Liar. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            Grover the Addict and Manipulator. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            Grover the Criminal and Predator. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            Grover the Fortune Hunter. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            Grover's Behavior After Receiving Payment For His Accusations . . . . . 12

            Grover's Trial Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            Grover's Accusations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            The Charged Acts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    3.      The Rectory. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    4.      The Detective. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    5.      The Therapist – Pauline Goupil. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    6.      Father Gordon MacRae. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    7.      The Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

i

Pretrial Publicity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

MacRae's Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Uncharged Acts Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Would-Be "Expert Testimony": Unsupported, Unsupportable,
and Inappropriate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

McLaughlin. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Leonard Fleischer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

8.      The Verdict. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

9.      Post Trial Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

TIMELINESS OF PETITION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CLAIMS FOR RELIEF AND SUPPORTING ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . 36

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

I.      MacRAE WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE
        ASSISTANCE OF COUNSEL BECAUSE HIS TRIAL COUNSEL:
        A) OPENED THE DOOR TO POWERFUL, OTHERWISE SUPPRESSED,
        "UNCHARGED ACTS" EVIDENCE, B) FAILED TO INVESTIGATE AND
        OBTAIN AVAILABLE EVIDENCE OF GROVER'S ADMISSIONS THAT
        MacRAE IS INNOCENT, C) PROVIDED THE STATE WITH THE DEFENSE
        CASE BEFORE TRIAL, D) FAILED TO OBJECT TO "EXPERT" TESTIMONY,
        AND E) FAILED TO CONDUCT CRITICAL DISCOVERY. . . . . . . . . . . . . . . . . . . 38

        A.      Introduction: Counsel's Conduct Assured MacRae's Conviction. . . . . . . . . . . . 38

        B.      Ineffective Assistance of Counsel: Clearly Established Federal Law . . . . . . . . . 39

        C.      Koch Facilitated the Admission of Dramatic Stories of Uncharged
                Acts, Furnished the State With Documents Containing the Defense
                Strategy, Failed to Object to Expert Testimony, and Refused to Conduct
                Meaningful Discovery. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

1.      Koch Assured MacRae's Conviction By Enabling the State to Present Highly Prejudicial "Uncharged Acts" Accusations That Had Previously Been Suppressed. . . . . . . . . . . . . . . . . . . . . . . . . . 42

      a.      Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

      b.      The Uncharged Acts Stories. . . . . . . . . . . . . . . . . . . . . . . . . . . 44

      c.      Causing Admission of the Other Acts Evidence Was Not Competent Assistance By Any Standard. . . . . . . . . . . . . . . . . . . 46

      d.      The Prejudice Caused by Defense Counsel's Actions is Enormous and Obvious. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

      e.      The State Court's Denial of MacRae's Ineffective Assistance Claim Based On the Uncharged Accusations is Based on an Unreasonable Application of Established Federal Law and Unreasonable Determinations of Facts. . . . . . . . . . . . . 49

2.      Counsel Failed to Obtain Evidence of Grover's Confessions that His Accusations Were Lies and MacRae Is Innocent. . . . . . . . . . . . . 53

3.      Koch Undermined any Opportunity to Confront the State's Case by Providing the State with the Defense Theory and Strategies Before Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

      a.      Koch Provided the State With the Defense Case. . . . . . . . . . . . 55

      b.      The State Court's Denial of the Ineffective Assistance Claim Concerning Giving Away the Defense Case is Based on an Unreasonable Application of Established Federal Law and Unreasonable Determinations of Facts. . . . . . . . 55

4.      Defense Counsel Facilitated the Admission of McLaughlin's Quasi-Expert Testimony that Bolstered the Accusations. . . . . . . . . . . . . 58

      a.      Though McLaughlin's Was Not Qualified as an Expert Witness, He Was Permitted to Present Expert Testimony. . . . . . . 58

      b.      Counsel's Failure to Object to Such Damning Testimony Could Not Have Been Strategy. . . . . . . . . . . . . . . . . . . . . . . . . 59

c.   The Prejudice of McLaughlin's Testimony Was a Critical Part of the Prosecution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

d.   The State Court's Justification for Rejecting MacRae's Showing Concerning Defense Counsel's Facilitating McLaughlin's Testimony is Unsupported By the Record. . . . . . . 59

5.   Counsel's Failure to Conduct Important Discovery Undermined the Defense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

II.   MACRAE IS ENTITLED TO RELIEF BECAUSE HE IS ACTUALLY INNOCENT.. 62

A.   Evidence of Innocence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

B.   Actual Innocence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

iv

TABLE OF CASES AND AUTHORITIES
*Cases*

*United States v. Villapardo*, 259 F.2d 934 (8 Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Appel v. Horn*, 250 F.3d 203, 210 (3 Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Beck v. Bowersox*, 257 F.3d 900, 901 (8 Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Berryman v. Morton*, 100 F.3d 1089 (3 Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Commonwealth v. Baran,* 905 N.E.2d 1122 (Mass.App.Ct. 2009). . . . . . . . . . . . . . . . . . . . . . . . 4

*Fisher v. Gibson*, 282 F.3d 1283 (10 Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Freeman v. Class*, 95 F.3d 639 (8 Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Friedman v. Rehal*, 618 F.3d 142, 155, 158  (2 Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Harding v. Sterns*, 380 F.3d 1034 (7 Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Kyles v. Whitley,* 514 U.S. 419 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*McQuiggen v. Perkins*, 133 S.Ct. 1924 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*McQuiggin v. Perkins*, __ U.S. __, 133 S.Ct. 1924 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Miller v. Anderson*, 255 F.3d 455 (7 Cir.),
*vac'd on other grounds*, 268 F.3d 485 (7 Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Miller-El v. Cockrell*, 537 U.S. 322 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Miller-El v. Dretke*, 545 U.S. 231 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*People v. Beauchamp*, 74 N.Y.2d 639 (NY 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*People v. Pitts*, 273 Cal.Rptr. 757 (Cal.App. 5 Dist.,1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Sawyer v. Whitley*, 505 U.S. 333 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Schlup v. Delo*, 513 U.S. 298 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Snowden v. Singletary*, 135 F.3d 732 (11 Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*State v. Carol M.D. and Mark M.D.*, 948 P.2d 837 (Wash. Ct. Of App. 1997). . . . . . . . . . . . . . 4

*State v. Cressey*, 137 NH 402 (1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*State v. Gonzalez*, 159 NH 74 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*State v. MacRae*, 141 N.H. 106  (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*State v. Martin*, 142 N.H. 63 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*State v. Michaels*, 625 A.2d 489 (1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*State v. Tierney*, 150 N.H. 339 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Strickland v. Washington*, 466 U.S. 668 (1984).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Thomas v. Horn*, 570 F.3d 105, 115 (3 Cir. 2009), *cert. denied*, 130 S. Ct. 1879 (2010)
and *cert. denied*, 130 S. Ct. 1942 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Bagley,* 473 U.S. 667 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Cronic*, 466 U.S. 648 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*United States v. LaPlante,* 714 F.3d 641 (1 Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Russell*, 221 F.3d 615 (4 Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Ward v. United States*, 995 F.2d 1317 (6 Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Wiggins v. Smith*, 539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Williams v. Taylor*, 529 U.S. 362 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Yung v. Walker*, 296 F.3d 129 (2 Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## Constitutional Authorities

United States Constitution
     Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
     Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
     Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
     Seventh Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
     Eighth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
     Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . 38

*Statutes*

28 U.S.C. § 2254 (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

28 U.S.C. § 2254(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

28 U.S.C. § 2254(d)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

New Hampshire Rule of Evidence 701. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Other Authorities*

Amon, Elizabeth, "Many Injustices Call for Many Lawyers." National Law Journal
 (December 27, 2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Armbrister, Trevor, "I'm not Guilty," Reader's Digest (May 1999). . . . . . . . . . . . . . . . . 4

Barber, M., Schneider, Andrew, "The Power to Harm" 5-Part Expose, Reporting,
and Analysis (and additional  articles), Seattle Post-Intelligencer, (February 1998
through March 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Editorial "Review and Outlook, New Day for the Accused." Wall Street Journal
(March 24, 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

http://en.wikipedia.org/wiki/Day-care_sex-abuse_hysteria. . . . . . . . . . . . . . . . . . . . . . . . 4

London, Bruck, Wright, & Ceci, "A Review of the contemporary literature on how
children report sexual abuse: Findings, methodological issues," Memory, 16, 29-47 (2008) . . . 31

London, K., Bruck, M., & Ceci, S.J., & Shuman, D.W. "Disclosure of child sexual abuse:
What does the research tell us about the ways that children tell?" Psychology, Public
Policy and the Law, 11, 194-226 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Nathan, D., & Snedeker, M, *"Satan's Silence: Ritual Abuse and the Making of a Modern*
American Witch Hunt," Harper Collins (New York: 1995). . . . . . . . . . . . . . . . . . . . . . . . 3

PBS Frontline, "The Child Terror," (October 27, 1998). . . . . . . . . . . . . . . . . . . . . . . . . . 4

Rabinowitz, Dorothy, "No Crueler Tyrannies; Accusations, False Witness and Other
Terrors of our Times," Wall Street Journal Books (New York: 2003). . . . . . . . . . . . . . . . . 4

Rabinowitz, Dorothy, "Not all accounts of sex abuse in the Catholic Church turn
out to be true: A Priest's Story." Wall Street Journal (April 27th and 28th, 2005). . . . . . . . . . . . . 2

Rabinowitz, "From the Mouths of Babes to a Jail Cell: Child Abuse and the

Abuse of Justice," Harpers (May, 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Rabinowitz, "Reckoning in Wenatchee," Wall Street Journal (September 21, 1999). . . . . . . . . . 4

Rabinowitz, "The Prosecutors," Wall Street Journal (April 25, 2002). . . . . . . . . . . . . . . . . . 4

Rosenthal, R., "Suggestibility, Reliability and the Legal Process,"

Developmental Review (September 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Shapiro, Laura, "Rush to Judgment," Newsweek Magazine (April 19, 1993). . . . . . . . . . . . . . 4

The Trials of Father MacRae," Wall Street Journal (May 11, 2013). . . . . . . . . . . . . . . . . . . . . 2

TABLE OF CONTENTS OF APPENDIX

Exhibit A                                       Trina Ghedoni Statement – September 23, 2008

Exhibit B                                       Charles Glenn Statement – May 21, 2008

Exhibit C                                       Debra Collett Statement – May 20, 2008

Exhibit D                                       Debra Collett Report – August 27, 2009

Exhibit E                                       Trina Ghedoni Report – January 30, 2009

Exhibit F                                       Diocese Press Release – September 11, 1993

Exhibit G                                       Trina Ghedoni Report – March 14, 2008

Exhibit H                                       Gordon MacRae Affidavit

Exhibit I                                       Pauline Goupil Hearing Transcript – July 15, 1996

Exhibit J                                       Trina Ghedoni Report – July 29, 2009

Exhibit K                       James Abbott Affidavit, Verifying Statements in Other Reports

Exhibit L                                       Pam Wagner Email – August 25, 2009

Exhibit M                                       Ron Koch, Esq. Letter – February 18, 1994

Exhibit N                                       Trina Ghedoni Report – April 23, 2008

Exhibit O                                       Patricia Grover Evaluation of MacRae

Exhibit P                                       Helen Wilson Evaluation of MacRae

Exhibit Q                                       Trina Ghedoni Report – August 13, 2009

Exhibit R                                       Steven Wollschlager Report – September 24, 2008

Exhibit S                                       Steven Wollschlager Statement – October 27, 2008

Exhibit T                                       Steven Wollschlager Report – August 28, 2008

Exhibit U                                       Thomas Grover Pretrial Interview – September 2, 1994

Exhibit V                                    J.R. Davis, Esq. Representation Agreement – November 17, 1993

Exhibit W                                    Leo and Penny Demers Report – May 12, 2008

Exhibit X                                    Trina Ghedoni Report – August 5, 2009

Exhibit Y                                    Thomas and David Grover Settlement Agreements

Exhibit Z                                    Tineesha Glenn Report – March 14, 2008

Exhibit AA                                   Shalina Glenn Report – March 14, 2008

Exhibit BB                                   Grover Criminal Record Excerpt

Exhibit CC                                   Charles Glenn Letter – January 9, 2013

Exhibit DD                                   Trina Ghedoni Statement – February 5, 2013

x

INTRODUCTION

In the early 1990s, it was well known in and around Keene, New Hampshire that the local Catholic Diocese was paying huge sums of money to young men claiming to have been abused by their childhood priests. Tom Grover, a drug addict and alcoholic with neither a job nor prospects, looked to his own payday. Grover accused father Gordon MacRae of having molested him as a teenager, and sued the New Hampshire Diocese. He won nearly $200,000 for his efforts and his testimony convicted MacRae of terrible crimes.

There was no evidence, but for Grover's claims, to suggest any improper conduct by MacRae. There was not a single witness to the acts alleged in Grover's stories of molestation, though it was to have happened in busy, populated places. The convictions – and the money – turned on Grover's performance.

Recently discovered evidence reveals that Grover admitted to friends and family that his accusations were lies manufactured to win Diocese cash. He confessed to committing perjury at MacRae's trial.

In addition to Grover's overall fraud on the criminal justice system, review of the record reveals a trial hopelessly warped by defense counsel's conduct that undermined its own case, served the state mightily, and assured the conviction.

MacRae's conviction came during a period of time that has since been widely recognized as fostering a wave of unjust sexual abuse accusations and convictions. Many convictions perpetrated during that time have been reversed and vacated, in light of cooler analyses of the way inaccurate abuse accusations were produced and leveled. A dispassionate analysis of MacRae's conviction reveals it to be just such a case – built on lies, overzealous police work, and defense counsel's

1

actions that were wholly contrary to MacRae's interests.[1] The result – MacRae's conviction and incarceration – based on nothing but lies, cannot be tolerated by the Constitution, reason, or any concept of fundamental fairness.

PROCEDURAL HISTORY

On April 30, 1993, MacRae was indicted in New Hampshire for Felonious Sexual Assault, Class B Felony (2 counts) and Aggravated Felonious Sexual Assault, Class A Felony (4 counts), related to Grover's allegations. He was tried on four of the Class A charges, and one Class B.

A jury trial was conducted over 10 days, between September 12 and September 23, 1994. On September 23, 1994, the jury rendered a verdict of guilt on all counts. On November 14, 1994, MacRae was sentenced to an aggregate prison term of 33½ to 67 years. He remains incarcerated. MacRae continues to maintain his innocence.

On September 25, 1995, an appeal was timely filed on MacRae's behalf.[2] His conviction was affirmed by the New Hampshire Supreme Court on June 6, 1996. *State v. MacRae*, 141 N.H. 106 (1996).

On April 24, 2012, MacRae filed a Motion for a New Trial in Merrimack County Superior Court, raising issues of ineffective assistance of counsel and newly discovered evidence. The Superior Court bifurcated the petition and denied it, without a hearing, on March 15, 2013 and July

---

[1]MacRae's case has also received critical media review that recognizes the injustice of his conviction. *See*, "The Trials of Father MacRae," Wall Street Journal (May 11, 2013); Rabinowitz, Dorothy, "Not all accounts of sex abuse in the Catholic Church turn out to be true: A Priest's Story." Wall Street Journal (April 27 and 28, 2005)

[2]Issues presented: The State Impermissibly Used Dr. Fleischer's Testimony to Prove that Grover's Allegations Were True; The Trial Court Erred by Failing to Exercise Any Discretion in Precluding the Defense From Cross-Examining Grover with His Juvenile Convictions; The Trial Court Erred In Instructing the Jury to Disregard Grover's Answers to Defense Questions.

2

9, 2013. A notice of Discretionary Appeal seeking review was filed in the State Supreme Court on August 12, 2013. Review was denied on September 26, 2013. This timely Petition for Habeas Corpus follows.

THE FACTS

1.      The Context In Which Grover Created His Stories

Grover's stories arose in the early 1990s, a time during which not only New Hampshire, but much of the United States was awash in similar claims. It was, the Second Circuit recently noted, a period in which "a series of highly questionable child sex abuse prosecutions" were fueled by a "vast moral panic;.... [A] period in which allegations of outrageously bizarre and often ritualistic child abuse spread like wildfire across the country and garnered world-wide media attention." "[T]remendous emotion [was] generated by the public" as a result of which "the criminal process often fail[ed]...." *Friedman v. Rehal*, 618 F.3d 142, 155, 158  (2 Cir. 2010). Those failures were outrageous. Bolstered by frantic prosecutors and a salacious media, incredible and impossible claims of molestation corrupted the objectivity – the very essence – of the criminal justice system, from investigations through verdicts and appeals.

The 1980s through middle 1990s brought about a series of impossible yet successful prosecutions. Convictions were won for allegations about: goats and "goatmen;" holes drilled into children; "magic arts" and witches; train rides during the school day; eyes stabbed with scissors; chopped up animals; and small children brutally raped night after night by many adults – without injury or discomfort to the children.[3] (f.n. 4, *infra*) Impossible as any of that is, convictions were won

---

[3]Nathan, D., & Snedeker, M, *Satan's Silence: Ritual Abuse and the Making of a Modern American Witch Hunt,* (Chapter Four, pp. 67-92) Harper Collins (New York: 1995)

3

– revealing how easily and completely investigators, prosecutors and juries are overcome by even the notion of child abuse.

Many convictions from that era have unraveled as litigation has provided an opportunity and context for dispassionate review.[4] Those verdicts seemed reasonable when they were handed down. But they have been reversed and vacated as time, perspective, and dispassionate appellate, post conviction, and federal habeas review have revealed their baselessness. Sober review has unearthed accusers who were – often inadvertently – manipulated by investigators, or liars pursuing their own motives.[5] MacRae's case has also provoked journalistic investigation and publication that has

---

[4]*E.g., Commonwealth v. Baran,* 905 N.E.2d 1122 (Mass.App.Ct. 2009)(new trial granted in 1985 conviction); *State v. Gausvik*, Sup. Ct. Chelan Co. Wash., No. 95-1-00371-1 (2000)(three of dozens of cases in which convictions were reversed or vacated due to admissions of false allegations, as well as evidentiary and constitutional errors); *State v. Hidalgo Rodriguez*, Wash. Ct. of App. 17600-2-III (1999); *Snowden v. Singletary*, 135 F.3d 732 (11 Cir. 1998)(writ of habeas corpus granted due to expert vouching testimony); *State v. Carol M.D. and Mark M.D.*, 948 P.2d 837 (Wash. Ct. App. 1997); *State v. Michaels*, 625 A.2d 489 (N.J. 1993)(conviction reversed due to expert overreaching and judge making unnecessary accommodations for child complainants); *People v. Pitts*, 273 Cal.Rptr. 757 (Cal.App. 5 Dist.,1990)(one of 34 Kern County convictions overturned); *People v. Beauchamp*, 74 N.Y.2d 639 (NY 1989); "The Power to Harm," 5-Part Expose, Reporting, and Analysis Series, Seattle Post-Intelligencer, (Feb 1998 through March 1999); www.historylink.org/index.cfm?DisplayPage=output.cfm&File_Id=7065 (last visited December 1, 2013).

[5]*See, e.g.,* Rabinowitz, Dorothy, "No Crueler Tyrannies; Accusations, False Witness and Other Terrors of our Times," Wall Street Journal Books (New York: 2003); Rabinowitz, "The Prosecutors," Wall Street Journal (April 25, 2002); Editorial "Review and Outlook, New Day for the Accused," Wall Street Journal (March 24, 2000); Amon, Elizabeth, "Many Injustices Call for Many Lawyers." National Law Journal (Dec. 27, 2000); Rabinowitz, "Reckoning in Wenatchee," Wall Street Journal (Sept. 21, 1999); Armbrister, Trevor, "I'm not Guilty," Reader's Digest (May 1999); Barber, M., Schneider, Andrew, "The Power to Harm" *supra*; Nathan & Snedeker, "Satan's Silence," *supra*; Shapiro, Laura, "Rush to Judgment," Newsweek Magazine, April 19, 1993; Rabinowitz, "From the Mouths of Babes to a Jail Cell: Child Abuse and the Abuse of Justice – a Case Study," Harpers (May, 1990); documentaries, including PBS Frontline, "The Child Terror," (Oct. 27, 1998); 48 Hours, May 5, 1993; 20/20, October 22, 1993. Even Wikipedia has a page "sex abuse hysteria" that catalogs and explains cases like MacRae's that have been reversed and vacated: http://en.wikipedia.org/wiki/Day-care_sex-abuse_hysteria (last visited Jan. 16, 2014)

undermined confidence in the conviction.[6]

Since the 1990s, a huge number of accusations have been made against Catholic priests for sexually abusing under-aged parishioners. Many accusers had economic motives to make up allegations, yet there was a sentiment that sex abuse was rampant in the clergy. Accumulating allegations and sensational reporting led to panic, overwhelming the Diocese and the Church itself, creating pressure to settle financial claims by accusers, to try (without great success) to limit the political and financial damage.[7]

MacRae's case came in the midst of the moral panic that infected law enforcement, the public, media, judicial system, and verdicts.   The newly discovered evidence of Grover's confessions to making up accusations and committing perjury in the grand jury and at trial prove MacRae's innocence. In light of Grover's admissions, the destructive impact of the behavior of MacRae's counsel becomes clear. Full and fair review – impossible until now – makes apparent the injustice of MacRae's conviction.

>        2.        The Accuser: Tom Grover – Liar, Addict and Criminal

**Grover the Liar**

Thomas Grover was a confessed liar long before accusing MacRae. In 1989, while attending one of many drug and alcohol treatment programs, Grover conceded:

I lied a lot to get what I wanted.... I lied and then would make alibis to convince others

---

[6]Rabinowitz, "Not all accounts of sex abuse in the Catholic Church turn out to be true: A Priest's Story." Wall Street Journal, two-part investigative editorial (April 27 and 28, 2005).

[7]The Catholic Church has paid to accusers some $2.5 billion since 1994 – $23 million of that coming from the New Hampshire Diocese.  Rabinowitz, *supra*, April 27 and 28, 2005.

5

because I had lost their trust. (T. 4/62-63[8])

His friends and relatives concur with those admissions. Scheming and lying are hallmarks of Grover's character. His former wife, Trina Ghedoni, and step-son Charles Glenn knew Grover as a "compulsive liar," "manipulator, [] drama queen," and "hustler," who "molded stories to fit his needs... lied to get what he wanted," and "who can tell a lie and stick to it 'till his end." Ghedoni explained that when Grover was confronted with his lies, he "would lose his temper and sign into the [psychiatric] unit in Elliott Hospital."[9] (**Exh. A; **Exh. B; **Exh. G; **Exh. N)

Grover's "dishonesty, misrepresentation and unwillingness to be honest about his problems" was a feature of his drug and alcohol treatment experiences. (**Exh. C) In 1987, in one of the several rehabilitation programs he failed, Grover claimed that he had been molested by, "among others": his foster father, a clergyman, and baby sitters. In "disjointed" accusations, he claimed to have been molested "by so many disparate people that his credibility was seriously in doubt," leaving staff to wonder whether "he was going for some kind of sexual abuse victim world record." (**Exh. D; T. Collett, 10, 15, 30, 45)

---

[8]"T" citations refer to the trial transcript volume number and page (T. vol/page). Trial transcripts with no volume number are cited (T. page, date). "Exh." citations refer to the exhibits submitted herewith. "**Exh." citations refer to newly discovered evidence.

[9]Glenn's reports about Grover's lying and perjury are corroborated by other evidence and objective facts presented throughout the petition. But, on January 9, 2012, Glenn wrote to MacRae's current counsel that he was "not completely truthful" with MacRae's investigator, former FBI investigator James Abbott, who, Glenn alleged: asked Glenn to lie for MacRae; said Glenn's mother (Ghedoni) was "having a rough time" and that "he would do what he could to help her out financially"; gave her a cell phone; paid her rent; and had "intimate relations" with her. (Exh. CC) He offered nothing to corroborate those claims, and refused to talk with a deputy sheriff who tried to confirm them. In a statement dated February 5, 2013, Ghedoni denied all of Glenn's claims and reaffirmed the truth of the reports she and Glenn had provided about Grover's lies. She explained that Glenn's recantation – and death threats against her – were retaliation for Abbott's and her failure to find a lawyer to handle his appeal. (Exh. DD)

As he developed his accusations against MacRae, recent investigation has revealed, Grover confessed to several people that they were lies. He confessed a planned "insurance scheme... in the Keene area." (T. 8/79, 82-87) He "often" commented to Glenn and Ghedoni that his accusations were lies, that he "had never been molested by MacRae," that he would "set MacRae and the church up to gain money for sexual abuse, and that he was going to set up MacRae and "get even with the church." (**Exh. A; **Exh. B)

Recently, Glenn recalled:

Grover would laugh and joke about this scheme and after the criminal trial and civil cash award he would again state how he had succeeded in this plot to get cash from the church.

On several occasions, Grover told me that he had never been molested by MacRae... [and] stated to me that there were other allegations, made by other people against MacRae and [he] jumped on and piggy-backed onto these allegations for the money.

(**Exh. B) Glenn reported that Grover "never changed his statements that he set up Gordon MacRae and the church." (**Exh. B.)

In 1994, Grover asked Ghedoni to marry him "because it would look better and, more importantly, he needed the security of a wife for the trial." (**Exh. G) During the entire time he and Ghedoni were together, "[Grover] never stated one word of abuse by [MacRae]." (**Exh. G)

**Grover the Addict and Manipulator**

Grover and his 12 biological siblings were removed from their parents' care "due to abuse and neglect associated with the parents' alcohol abuse."(T. 34-35, 9/13/94) He was adopted by Elmer and Patricia Grover, and became one of eight adopted siblings.

Ms. Grover had "always been worried for the potential [of Grover's alcoholism] because I knew that... both [birth] parents were alcoholics..." (T. 6/82) She should have been concerned also

7

about the effects of her other sons on Grover. They started him drinking as early as 1979, at 11 years old. (T. 3/4; T. 4/25).

In 1982, Grover told his mother that his father was having an affair. Mr. Grover moved out of the house, and the Grovers divorced a year later. The disintegration of the marriage was particularly hard on Grover, who believed it was his fault. (T. 2/48)

Grover blamed his increasing alcohol intake on his parents' marital problems:

[E]very opportunity, [I] would just go out with [my brothers] and drink... (T. 2/52)

... it got worse when the separation was going on and I really started drinking.... (T. 2/53)

... at any available moment that I could get it, I would drink; and that's how it went; and that's how it went.... It was a fairly steady pattern....I went looking for the opportunity to drink and it took a lot of the pain away. (T. 3/6)

By the time of the divorce, Grover had been drinking for four years. He was a 15-year-old alcoholic.

Ms. Grover knew that she was unequipped to deal with such severe addictions. She had known MacRae as a priest for several years and was impressed with him and his relationship with the entire Grover family. She thought he could help her son. (T. 6/44-45, 64-71, 83-84)

MacRae tried, but eventually found himself no more equipped than Ms. Grover to address such extraordinary illness. But if MacRae was of no spiritual or constructive assistance, Grover found other uses for him – at first to bail him out of trouble, and finally as a means to fortune.

In 1985, Grover was arrested for burglary and forgery. He ran to MacRae for help, confessing that he was an alcoholic and drug addict. Moved, and with hope for Grover's success, MacRae intervened, urging the court and prosecutor to forego prosecution in favor of admitting Grover to the Beech Hill residential rehabilitation hospital. MacRae had helped to get other parishioners into the

8

same types of programs. (**Exh. S; T. 3/29; T. 6/169-171; T. 7/14) Grover used his Beech Hill admission to get clear of the felony charges, and then left the program without completing it. (T. 3/29) Still trying to be of service, MacRae helped to place Grover into a number of other drug and alcohol treatment programs.

When Grover was admitted to a program at Derby Lodge in 1987, he confessed to drinking 12 to 18 beers a day and regular use of mood and mind altering drugs, including marijuana, hashish, cocaine, opium, amphetamines and other hallucinogens. He reported that he "became intoxicated with his first consumption," was a "black out drinker" every time he drank, and had a history of shakes and sweats while drinking. (T. 19, 9/13/94 Collett trial transcript) Grover was kicked out of the Derby Lodge program when he was caught smuggling drugs, 19 days into the 28-day course. (T. 3/29-30; **Exh. H)

MacRae helped place Grover in at least six other programs. He lasted through some, but none made a difference. (T. 3/28-32, T. 19, 9/13/94; **Exh. I, p. 19; Exh. U, p. 12-17, 50, 57, 71, 121) His substance abuse ran unabated. He became such a destructive force that his mother threw him out of the house – telling him not to come back. (T. 6/97; T. 116-117, Exh. Grover 9/2/94, pretrial deposition)

**Grover the Criminal and Predator**

Alcohol and drugs were not Grover's only problems. In addition to his 1985 burglary and forgery arrests, Grover's rap sheet included two thefts, two forgeries, theft by deception, and another burglary. (T. 6/163) In 1990, he pled guilty to yet another burglary. (T. 3/30-31) In the early 1990s, after breaking Ghedoni's nose, Grover was arrested for resisting arrest and assault on an officer. (**Exh. J)

9

Grover also established credentials as a sexual predator. Ghedoni had two daughters when she met Grover. He frightened them from the start. They recognized him as a "sick individual who was obsessed with sex and teenage girls," a "creep," and "pervert," who was "constantly eying" and groping them. Particularly frightening was to wake in the middle of the night to find Grover in their room, between their beds, staring at them. (**Exh. Z; **Exh. AA)

Grover accepted no responsibility for any of it. Through sobs and tears at trial, he blamed it all on MacRae.

Grover's addictions continued after trial, and his rap sheets continue to grow with charges of all sorts of things, from traffic infractions, to violent crimes in at least three states and Native American jurisdictions. (**Exh. BB)

**Grover the Fortune Hunter**

In the early 1990s, the New Hampshire Catholic Diocese paid millions of dollars to men alleging molestation by their priests. Steven Wollschlager, a local teenager at the time, recalls the diocese's reputation as an easy mark:

> In the early 1990s, all the kids in Keene, New Hampshire bragged about how easy it was to set the priests and the church up for money over sexual abuse charges. All the kids were aware that the church was giving out large sums of money to keep the accusations from becoming public and this fed the imagination of the local kids to join in these allegations.

(**Exh. T)

Grover applied himself to the pursuit of that money, as did his brothers. Ultimately, the brothers Grover collected more than a half-a-million dollars in diocese cash. (**Exh. H, **Exh. Y)

Before leveling criminal accusations, Grover went to see civil attorney William Cleary. (T. 3/57) At trial, Grover denied that he and the lawyer talked about anything having to do with

"possibly bringing a suit for damages against Gordon MacRae." They met, he said, "not about specific things." Or, "just to talk about options." Or, "options" for suing MacRae and the diocese were discussed. Finally, Grover confessed, "the possibility of a cause of action" against MacRae and the diocese was discussed. (T. 3/57, 58) Cleary referred Grover to Keene Police Department Detective James McLaughlin. (T. 3/65-67) Grover was also directed to Attorney Robert Upton, who served him as his lawyer through his diocese payment.

A criminal conviction would assure a victory in a civil lawsuit. The only substantive issue would be how much money Grover would get. Grover remained close to his civil attorneys throughout the criminal process. He periodically called them "for money or cash advances on his expected cash award," and received "cash advances." (**Exh. B) Detective McLaughlin seems to have worked with Grover's civil attorneys, and conducted at least part of his investigation from Upton's office. (Exh. U, p. 63)

Grover claimed that his lawsuit was not for personal gain, but rather for the "safety of all the other people." He would rather send MacRae to prison than have a "million dollars," Grover said. (T. 3/37, 46) Of course, he was pursuing diocese money at the very moment that he made that statement to the jury.

Grover told the jury that he only wanted money for therapy necessary to deal with problems caused by MacRae: "shame and guilt...[and] hurt inside," "feeling suicidal.... not knowing how to deal with life," not trusting people, "feel[ing] things in my heart the way I used to," and "do[ing] something to deal with all the things that just rip at my heart every night and every day," including crying himself to sleep, and "tak[ing] four or five showers a day trying – to feel – to try to feel clean again." (T. 2/41, 42, 47;  3/36, 39, 40, 47) He had been attending therapy for two years, he said, but

11

could not afford to continue without the lawsuit money. (T. 3/36)

Grover's civil attorney had "a business relationship with the head person," at the New Life Center, and "asked if he would provide counseling for [Grover]." (T. 6/150) Therapist Pauline Goupil charged Grover twenty-dollars for each fifty-minute session. (T. 5/52-53) Grover attended very few sessions – though he claimed at trial to have been in treatment with Goupil for "two years to talk about [abuse]."

Grover's therapy schedule: "When I want to go, then I just go." (Exh. U, p. 19) That wasn't often. Over the course of those "two years" of therapy, he saw Goupil 19 times – fewer than 15 hours. Worse, when the trial court reviewed Goupil's Grover files, it found "nothing about Mr. MacRae in those records." (T. 3/43) That is consistent with Grover's statements to Ghedoni and Glenn – that his visits with Goupil were for nothing but "to gain jury appeal," and to convince the jury "that his  problems were a result of the molestation by MacRae." He told Glenn that his civil attorneys wanted him to "act crazy, as this would be helpful in the trial.'" (**Exh. B; **Exh. N) Once Grover received his diocese check, Goupil never saw him again. (**Exh. I, pp. 7-8, 85; **Exh. Q)

**Grover's Behavior After Receiving Payment For His Accusations**

Grover abandoned his "victim" role once he was paid. For his accusations, in March 1997, the Diocese handed over a check for $195,000 (**Exh. Y) He photographed himself with $30,000 in cash and took the money around to show friends and relatives, and photograph them with it. Glenn recalls that Grover came to visit with a bag of money, "fanned it out to take pictures of it, all the while, bragging about 'putting it over on the church.'" (**Exh. A; **Exh. B; **Exh. E)

Though Grover told the jury he wanted the money only for therapy, in August of 1997, Grover took the money and Ghedoni to Arizona, where he blew it all on alcohol, drugs, cars,

gambling, pornography, and motel rooms in which to indulge his vices. He lost about $70,000 in one three-day gambling spree, and a Nevada casino was pursuing him for $50,000 more. Ghedoni left Grover in March of 1998, when she found him in bed with his biological sister. (**Exh. G; **Exh. B; **Exh. Q)

**Grover's Trial Testimony**

The lies that Grover admitted to his family and friends were reflected in his testimony. Shifty stories and his inability to maintain a consistent story evidenced the baselessness of his claims. Grover's accusations and testimony were fantastic, nonsensical, and contradictory – even about the simplest things. For example during his testimony:

● Grover described himself as not nervous and "very nervous," not apprehensive and had "a lot of anxiety." (T. 2/42; 3/44, 47; 4/9)

● Grover remembered details during direct examination, but not on cross-examination, because remembering "overloads my mind and.... leaves me more or less in shock for days after...." (T. 6/10,11)

● Grover claimed that he had not reported abuse during the decade between its alleged occurrence and his meeting with the civil lawyer because: a) he had repressed the alleged abuse (T. 6/10); and b) it was "difficult to talk [about it] in front of people" (T. 2/42); and c) he did talk about it. (T. 3/33) It is not clear whether Grover was unaware of having been abused, at the same time that he could not, yet did, talk about it.

● Grover might have forgotten each act immediately after it occurred. Or, at the time of each act, he might have forgotten that the earlier acts occurred. Or he might have remembered. At trial, he couldn't remember. (T. 5/38-41)

13

●     Grover claimed to have been so traumatized during the alleged acts that to describe him as "emotionally upset" and "crying," would be "a mild statement." He "los[t] control." But, he hedged, he lost control silently. (T. 3/103) For Grover, losing control is "not a vocal thing... I'll shake and just freeze up... I'm not vocal. I don't cry out loud...." (T. 3/103-104) According to him, even when hysterical, he makes no sound:

> If I was crying hysterically or out of control.... if I was sitting here, it wouldn't be like you could hear me on the other side of the door.

(T. 3/103-104) Grover's conduct at trial belied that claim. Several times, Grover's sobs and crying were dramatic enough that recesses were necessary. (*i.e.*, T. 2/41; T. 3/22)

●     Grover claimed to have been in a trance every time he was molested; motionless, crying noiselessly, while neither he nor MacRae spoke a word or made a sound. (T. 2/31; T. 3/15, 26)

●     Grover conceded that his accusations increased and changed as therapist Goupil, prompted him to "walk through certain stages – a little bit at a time and as [Goupil] walked through it with me, it came to the surface even more." (T. 6/9-10; **Exh. I)

●     Grover claimed that MacRae made it impossible to have a close relationship with a woman. Nevertheless, he had a years-long, "quite close," "extremely close," "deep seeded," and loving relationship with girlfriend Katherine Hall during the time of the alleged abuse, and at trial was in a close, 5-year, relationship with his wife, Ghedoni. (T. 5/84; **Exh. A, p. 1)

●     Grover testified that his drinking problem in 1983 was so great that he drank at "every opportunity," and also that his drinking then was "just sporadic," not serious. (T. 2/52-53; T. 5/13)

●     Grover's trial appearance was influenced by Goupil, who coached him from the gallery. (**Exh. X) On at least one occasion, Grover watched Goupil as she "place[d] her finger on her right cheek just at the eye level and slowly move[d] her finger down her cheek with a distinct sorrowful

14

frown on her face. Grover observed this and began to cry and wept for a good part of his testimony."

That was in "stark contrast to Grover's behavior after his testimony, in the hall outside the court,

where Grover was jumping up and down and laughing and joking with some of his supporters."

(**Exh. W; **Exh. X)

● Grover was on prescription drugs while he testified, but didn't know what he was taking. (T. 3/47; 4/9)

● In a particularly ridiculous claim, Grover, a grown man, with criminal history of violence, in a courthouse full of people and court officers, claimed that upon seeing MacRae in a public hallway, he was "so afraid" that he "ran back down the stairs." (T. 3/39)

**Grover's Accusations**

Grover's stories changed meaningfully between the several times that McLaughlin questioned him before trial and his appearance on the witness stand. For example, at trial, Grover was very specific that each act of abuse was preceded by MacRae "belittling" and "degrading" him. He never mentioned that to McLaughlin. Nor did he tell McLaughlin about the out-of-body experiences, blacking out, and floating above himself that he offered to the jury. (T. 7/122 - 127, 130) A particularly bizarre Grover story that was jettisoned before trial, concerned a 1987 car chase in which MacRae (in a car and brandishing a pistol) chased Grover (unarmed and on a bicycle) through the streets of Keene, into a cemetery, and out of town. (Exh. U, pp. 51, 59-60, 100-109) Grover said that he reported that to McLaughlin – whose reports contain no such thing. (Exh. U, pp. 60, 64, 9/2/94)

**The Charged Acts**

Grover claimed that MacRae molested him in the rectory five times, between June 6, 1983 and just after Labor Day (September 5, 1983).

15

Before trial, he claimed to have been molested four times in the office on the Southwest side of the first floor, and once on the third floor. As the trial approached, it became clear that another priest was assigned to the Southwest office. Grover changed his story – moving two acts to the Southeast office. Thus, his accusation was no longer undermined by the presence of another priest and evading the absence of opportunity. (T. 3/11, 15, 18, 21; T. 7/111)

The reason he and MacRae went into the offices was, Grover conceded, because there were so many people directly around them. "[P]eople just walked in and out [of the area directly outside the offices] and there were people in there at all times of the day.... There were always people coming in and out....", Grover said. So, they went into the offices, leaving all of those people just outside the doors. (T. 5/8, 26-27, 32-33) Yet, no one ever saw or heard anything inappropriate.

Grover testified that while talking to MacRae on two occasions in the Southwest office, MacRae "became critical," "degrading," "belittling," and "berating," walked across the room, unzipped Grover's pants, "and started performing oral sex on me..." for 15 minutes, while Grover cried. (T. 3/14-18; T. 4/118; T. 5/9-10, 14, 19).

Grover said that while talking to MacRae on two occasions in the Southeast office, MacRae "became really critical," "degrade[d]," "belittle[d]," and "berat[ed]" him, walked across the room, unzipped Grover's pants, "and started performing oral sex on me..." for 15 minutes, while Grover cried. (T. 3/21-24)

Grover offered some ambient details to enhance his stories. These were lies. Indeed, he admitted several to Ghedoni.

- Grover claimed that the first Southeast office incident "started out as just a friendly game of chess," played on a marble set, across from the couch. (T. 3/19-21)

16

**In fact**, Grover added the chess set for the jury. Grover confessed to Ghedoni that the chess set lie was "what they wanted.... It fits." (**Exh. A) He never mentioned it to McLaughlin. (T. 7/130-131)

**In fact**, there was no chess set in 1983. MacRae bought it in 1986, while on vacation in Bar Harbor, Maine with Father Maurice Rochefort and two nuns – Pam Wagner and Fran Listen. (T. 8/71-74; **Exh. L)

**In fact,** there was never a couch in the southeast office. (T. 8/13, 33 )

• Grover claimed that MacRae  "went and... locked the door," and he "would usually lock the door of the office." (T. 3/23; T. 5/29-30; T. 7/131)

**In fact**, the doors did not lock. Caretaker, Fred Lafond, worked in the church and rectory for 24 years. He testified that the locks had been painted over years before MacRae arrived. (T. 8/31-33) Confronted with the fact of doors that did not lock, Grover changed his claim: "[MacRae] went over and like he was locking the door..." (T. 5/29-30)

• Before trial, Grover claimed that during one alleged act, MacRae stopped when they heard a noise outside the door. (T. 7/125) Faced with the fact that sound travels through doors in both directions, Grover changed his claim. It wasn't a noise. It was a wooden floorboard that "could make a noise.... [and] might creak on the other side of the door." (T. 3/106) In addition to the fluidity of Grover's claims, the floors were not wood. (T. 8/30)

• Grover claimed that he told a drug treatment counselor about abuse by MacRae, and that she did not believe him. (T. 34-36) That never happened. The counselor explained that Grover came to her with accusations of abuse against a number of people, but not MacRae. (**Exh. D; T. Collett, 10, 15, 30, 45)

17

- "At different times I remember different things," Grover admitted. Thus, according to Grover: 1) MacRae did, and did not, unzip Grover's fly; 2) did, and did not, fondle his penis; 3) Grover might, or might not, have told McLaughlin about his opened (or closed) fly; and 4) Grover might, or might not, have been fondled on one occasion. (T. 4/15-16)

Other than to say that the alleged third floor of the rectory event was not the first, Grover did not know when it occurred – even in relation to the other claims. (T. 4/112-113)

3.    The Rectory

Grover claimed assaults occurred in the St. Bernard's church rectory – a busy place. Four priests lived and worked there in the summer of 1983: Father Dupuis, Father Bombardier, Father Houle, and MacRae.[10] Caretaker Fred Lafond lived there too, and at times shared an office with MacRae. (T. 3/81-82, 86, 87) One of two church secretaries lived in the rectory. A bookkeeper and a cook worked there as well. (T. 3/80-81)

The rectory kitchen is on the main floor, as are a bathroom, and living room, used for meetings, four business offices, and the dining room. Two stairways open into that floor, there are three doorways to the outside, and many windows.

Also on the main floor is a large reception area, in which two secretaries worked – sometimes six days a week. (T. 8/13, 20; T. 3/78, 81). Grover described the reception area as:

> one of the main avenues in the house, that entry office, people just walked in and out and there were people in there at all times of the day.
>
> [a] central area where most of the activity [took] place...
>
> the most populated place in the rectory that was like the center point of the rectory.... it was just people coming in and out; whoever might have been there, the priests were there....

---

[10]Dupuis was at St. Bernard's from June, 1981 through July, 1983. Bombardier lived there during that time. Houle was away during July, 1983. (T. 7/24-25)

The reception area was also used for "other purposes" and "a lot of stuff," including as a mail room. At random times and unannounced, people came and went through there. (T. 3/78-79; T. 5/7-8, 27) That area "never slows down," even in the summer, Father Biron explained. (T. 8/13)

Grover claimed that abuse occurred in two of the priests' offices on the first floor. The doorways to both offices open into the reception area. One of them has a glass window – that might have had a "sheer" piece of fabric over it at one point, but never anything obscuring the view through it while MacRae was there. (T. 8/36, 46) Numerous outside windows looked into the offices from Main Street, the church, the driveway, and the parking lot. (T. 3/19-21)

Grover conceded that sound could be heard through the office doors. He had heard parishioners crying during meetings with priests. (T. 5/130) The door locks did not function and were painted over by the time MacRae arrived at the rectory. (T. 7/33; 8/11-12, 26, 31; T. 8/40)

On the second floor is another living room, a bedroom for a priest, two guest rooms and the bookkeeper's office. Two staircases opened into the second floor. MacRae lived on that floor from June through August, 1983.

There are two bedrooms with adjacent studies and baths, and a guest room on the third floor, and one stairway opened into it. (**Exh. H)

4.    The Detective

Grover's first civil lawyer referred him to Detective James McLaughlin, who led the effort against MacRae. (T. 3/65-67) His methods raise significant questions about the fairness of the investigation.

McLaughlin was a self-proclaimed specialist in child sexual abuse, and claimed to have substantiated "over a thousand" sexual abuse victims in the 750 cases on which he had worked. (T.

19

7/36-37, 47) Those numbers suggest a bias in favor of proving a hypothesis of guilt, rather than critical investigation of accusations.

Examples of questionable police tactics are revealed in the newly discovered evidence. These include badgering and coercing witnesses, misrepresenting witnesses' statements, making inaccurate report entries, and collaborating with Grover's civil lawyer.

One prosecution problem was that Grover did not accuse MacRae until his civil statute of limitations was near expiration – suggesting that his accusations were made only to support his civil claims. To overcome that, Grover claimed that in 1987, he reported abuse to drug treatment counselor, Debbie Collett – and thus his accusations were not new-found. (T. 3/33) Collett was pursued for corroboration, but she could not oblige. Grover never alleged that. (T. 7/103)

Collett's records reveal that after an in-patient group session in which other patients challenged Grover for lying, Grover came to Collett offering "disjointed" claims of molestation when he was a small child, by a foster father, Mr. Grover, and a clergy person, "among others." (T. 15, 29-30, 9/13/94, Collett trial transcript)

Collett was pressed to corroborate Grover's claim that he told her of abuse by MacRae. She was visited at home by at least one detective who bullied and badgered her. Collett described her experience – not with "an investigator looking for what information I had to contribute...." Rather, Collett described the questioning as an attempt to substantiate the "belief in Gordon MacRae's guilt."

> I was uncomfortable with [detective Clark's] repeated stopping and starting of his tape recorder when he did not agree with my answer to his questions and his repeated statements that he wanted to put [MacRae] where he belonged behind bars, that a priest of all people should be punished. I confronted Detective Clark about his statements and his stopping and starting the recording of my statement, his attitude and his treatment of me which seemed to me to include coercion, intimidation, veiled and more forward threats as well as being disrespectful. At that point and in later dealings, I was overtly threatened concerning my reluctance to continue to subject myself to their tactics, with threats of arrest....

20

My overall experience... was one of being bullied, there being an attitude of verbalized animosity, anger and preconception of guilt regarding Gordon MacRae. They presented as argumentative, manipulative and threatening via use of police power in an attempt to get me to say what they wanted to hear.

(**Exh. C)

A document was later prepared and purported to be a transcript of the meeting. It did not, however, reflect Collett's statement. (T. 7-16, 9/13/94 Collett) Collett's requests for a copy of the tape were ignored and denied. Nor was the defense ever provided with a copy of the tape. (T. 11, 9/13/94 Collett; **Exh. D)

In 1994, McLaughlin similarly pursued Grover-contemporary, Steven Wollschlager, for accusations against MacRae. Wollschlager was one of MacRae's parishioners who was counseled by him in 1988. Assured by McLaughlin that he would be "reimbursed" for his time, Wollschlager met with him. "The lawsuits and money were of greatest discussion," Wollschlager recalls,

> and I was left feeling that if I would go along with the story, I could reap the rewards as well.... McLaughlin had me believing that all I had to do is make up a story about [MacRae] and I too could receive a large sum of money as others already had. McLaughlin reminded me of [my] young child and girlfriend and ... that life would be easier for us with a large amount of money.... It seemed as though it would be easy money if I would [] accuse [MacRae] of wrong doing.

(**Exh. S) At first, Wollschlager refused. He had never been molested.

Then, lured by "easy money," Wollschlager made up claims for McLaughlin. (**Exh. S) But even that was not enough for the detective – who enhanced what statements he managed to elicit. (**Exh. T) Recently, Wollschlager reviewed McLaughlin's report of his statements and found things he never said. For example, McLaughlin's version had Wollschlager attending high school in the wrong town, making late night collect phone calls to MacRae (though they lived in the same town), and sleeping in the rectory. McLaughlin's report attributes to Wollschlager a comment that MacRae

21

did not molest him because Wollschlager wasn't attractive enough. Wollschlager said none of that. Nor is it true. (**Exh. R; **Exh. T)

Ultimately, Wollschlager did not support McLaughlin. "I could not bring myself to give perjured testimony against [MacRae], who had only tried to help me." Before trial, Wollschlager told the county attorney, "I know what this is about and I don't want to be part of it." Without comment or question, he was told he was not needed. (**Exh. R; **Exh. S)

Another example of McLaughlin's preconception of guilt, without investigation, is found in Grover's claim that MacRae locked the office doors when inside with Grover. The locks were painted over and non-functioning during MacRae's entire time in the rectory. McLaughlin would have known that (and that Grover lied) if he had bothered to look at the locks and talk to caretaker Lafond. (T. 7/131)

McLaughlin also spent time with Grover's civil attorney, Robert Upton. On April 1, 1994, for example, Grover, McLaughlin, and Upton met in Upton's office, from which the three set up a telephone call to MacRae for Grover to make accusations, in the hope of eliciting an incriminating statement. (Exh. U, p. 63) Why McLaughlin and Upton worked together is not clear. McLaughlin's reports include nothing of a joint investigation, operations or phone calls from the civil lawyer's office in Concord, 50 miles from Keene.

5.    The Therapist – Pauline Goupil

Goupil's role in the development and presentation of accusations is unclear. Her official contemporaneous "therapy" records conflict with her testimony. If, consistent with her records (as described by the trial court), she and Grover never discussed MacRae, then her testimony about such discussions was false. Or, if her testimony is truthful (that she and Grover discussed MacRae), then

22

her official records are fiction. The following is from the record:

- Grover was referred to Goupil through his civil attorney who had a "business relationship" with the head of the organization for which she worked. (T. 6/150)

- Grover admitted to Ghedoni and Glenn that he was sent to Goupil not for treatment, but "to gain jury appeal" and persuade the jury that "problems were a result of the molestation by MacRae." (**Exh. B; **Exh. N)

- Grover met with Goupil for fewer than ten hours, by the time of trial – 11 sessions of 50 minutes. (**Exh. I, p. 85, 7/15/96)

- Goupil's contemporaneous records of her Grover-sessions contain "nothing about MacRae," the trial court found upon *in camera* review. (T. 3/43)

- Contradicting her contemporaneous records, Goupil testified that Grover spoke about "memories of sexual abuse." (T. 7/8)

- Goupil "validated" Grover's claims by using methods to "help[] him remember certain events that had occurred...." all of which produced more stories. (T. 7/8)

- Grover described Goupil helping him remember stories of abuse. She "walked [him] through accusations, and "validat[ed]" and "honor[ed]" the stories as truth. (T. 6/8-10; 7/8 - 10)

- Goupil conceded that addictions like Grover's can in fact be the result of genetics. But without offering any scientific or other support, declared that only MacRae could have caused Grover's addictions. (**Exh. I, p. 85)

- Goupil conceded that a therapist might "enhanc[e]" a patient's "memory process," resulting in inaccurate reports, but said she would never do such a thing. (T. 7/8, 9) She ignored undisputed scientific literature documenting that inadvertent, unknowing, and often unavoidable presence of

even subtle forms of influence is as capable of corrupting reports as that which is intended.[11]

●     From the courtroom gallery at trial, Goupil coached Grover, at one point directing him to cry.
(**Exh. W)

> ### 6.     Father Gordon MacRae

MacRae arrived in Keene as a seminary student in the summer of 1979. Evaluations by
parishioners were very favorable. Ms. Grover, for example, commended his engagement in parish
life and with "young people...families and the elderly." She concluded she would "love" for him to
become a pastor in the parish. "As I have said, we like him and respect him. We think he will be an
excellent priest." (Exh. O) Parishioner Helen Wilson was similarly impressed by MacRae's efforts,
"with the young people preparing for confirmation," "visiting the elderly and the sick," and "taking
part in parish liturgies." "MacRae has become a friend to me, my husband and my children.... We
will miss him." (Exh. P)

The next two summers, MacRae was assigned to churches in nearby parishes. (T. 6/69-70)
The Grovers maintained contact with MacRae who, from time to time, would call or stop at the
Grover house. (T. 6/116; **Exh. H)

In 1983 – then a priest – MacRae moved to the St. Bernard's rectory in Keene. (T. 3/7) He
entered parish life, making himself available every day, at any hour. He was dedicated to the daily
needs of his parish, and spent considerable time driving parishioners from place to place, feeding
them, providing clothing, assisting to find counseling and rehabilitation programs, and providing

---

[11]*See*, Rosenthal, R., Suggestibility, Reliability and the Legal Process, *Developmental
Review,* September 2002 (explaining relevant scientific research literature, and its application to
legal and constitutional principles).

spiritual guidance.

<u>MacRae's Good Intentions Were No Match for Grover's Self-Interest</u>

MacRae and Ms. Grover were close, and she encouraged his relationship with the children. When she could not handle Grover's addictions and behavior, she sent him to MacRae, hoping for salvation. (T. 6/82-85) She overestimated his abilities. MacRae did what he could, but  was not up to the task.

MacRae's utter failure with Grover, and Grover's total manipulation of him, evidences a clumsy naivete that undermines any notion of a stealth, sophisticated planner and schemer who could have committed the alleged acts, many in public places, without being discovered.

That MacRae allowed himself even to be alone with a manipulative, criminal, alcoholic, drug-addict, teenager reveals clouded judgment, at best. Car rides created even more obvious vulnerability to accusations. Yet, MacRae was unaware.

MacRae was more than naive when he was confronted by McLaughlin. Rather than simply deny the accusation that he was a pedophile, MacRae instructed McLaughlin that given Grover's age at the time of the alleged abuse, the proper term would be "phebephile," not  "pedophile." (**Exh. H) Thus, McLaughlin was free to claim that MacRae confessed. (T. 1/9) MacRae's comment was not a confession. He denied the accusations when he first heard them, and denies them still. But his need to be heard resulted in that ill-advised comment.

A key defense argument was that Grover made up his claims in pursuit of his windfall. (T. 5/56; T. 6/141-149) MacRae undermined that, however, by filing a lawsuit against Grover, the Grover family, Grover's civil attorney, McLaughlin, and the prosecutor, alleging meritless claims

based on the criminal prosecution.[12] (T. 6/141) It looked like an attempt to quash the criminal accusations by threat of civil damages. The lawsuit also cast Grover's civil suit as a response – rather than a grab for Diocese money.[13] The prosecutor made much of MacRae's lawsuit. (T. 6/141-144)

MacRae's conduct is not  the work of someone capable of maintaining a pattern of clandestine molestation over a period of years – particularly in light of the state's claim that he maintained similar secret assaults on a number of other boys during that time.

7.    The Trial

During the 10-day trial, the state presented 12 direct and three rebuttal witnesses. No one saw or heard any alleged acts. The case turned on Grover's credibility – bolstered with bits of ersatz psychology and vouching from state witnesses. The defense presented seven witnesses. Collett and Goupil testified outside the presence of the jury.

**Pretrial Publicity**

The church convicted MacRae in the press before the trial began. Before trial, the New Hampshire Diocese issued a press release proclaiming MacRae's guilt:

> The Bishop and the Church are saddened by and grieve with the victims of the alleged actions of Gordon MacRae.... the church is a victim of the actions of Gordon MacRae as well as [the victims]....

(Exh. F) Thus, the church immediately allied itself with Grover – claiming a bond as victims. The statement, a defense from corporate liability, convicted MacRae before the jurors took their seats.

---

[12]MacRae's complaint alleged: Conspiracy, Libel, Slander, Malicious Prosecution, Intentional Infliction of Emotional Distress, Abuse of Civil Process, Negligence, Negligent Prosecution, and Soliciting Perjury of a Witness.

[13]Grover's lawsuit was not filed until six months after MacRae sued Grover. (T. 6/141)

### MacRae's Counsel

MacRae's counsel did nearly as much to convict him as did the state. More than ineffective, counsel served the state – all but guaranteeing a conviction.

New Mexico attorney Ron Koch was the lead counsel. New Hampshire attorney J.R. Davis was to be "local counsel only," "...for the purposes of assisting in filing paperwork and advising [Koch] regarding our rather quaint local practices and procedures." Davis was not to review discovery, and his fee was based on his limited role. (Exh. V)

Prior to trial, the court suppressed dramatic Grover-stories of uncharged acts of alleged molestation that were to have occurred before the acts for which MacRae was on trial. (T. 1/9-10) *Infra*, p. 42-45. The suppression order was critical to the defense. Admission of Grover's uncharged acts stories would nearly double the number of accusations that MacRae would have to defend. Yet, during his opening statement, Koch made a comment that opened the door for them all, completely undermining his and MacRae's credibility. (T. 1/52, 59; T. 2/4-5) The state took full advantage, presenting that dramatic material through Grover, his mother, brother, and McLaughlin. The weight of so much uncharged acts evidence crushed the defense.

During discovery, the state provided a considerable amount of material, including witness statements and other documents concerning the accusations. MacRae reviewed those documents and annotated them with comments, analyses, impressions, explanations, and strategies for trial. Those annotations were a working document for the defense; the outline of the defense theory and strategy. Nevertheless, attorney Koch sent all of that annotated material back to the prosecutor. (Exh. M) The prosecutor described the windfall to the court:

27

> [T]he defendant, a rather unusual occurrence in a criminal case, provided the state with work product, basically Gordon MacRae's response, detailed response to each and every paragraph of the state's voluminous discovery.

(T. 7/67)

Because MacRae did not testify, the state had few statements to use against him. MacRae's annotations provided the state with statements and materials from which it could undermine his credibility and even create inferences of admissions. (T. 7/99-104)

In addition, during his investigation of the case, defense counsel sent questionnaires to several potential defense witnesses as preliminary interviews. Those completed questionnaires were also sent to the prosecutor, thus, identifying potential defense witnesses and disclosing their testimony well before trial.

Providing the defense strategy, defendant's statements, and identification of potential witnesses and their statements, to the state before trial, once again fortified the state and left MacRae defenseless.

Defense counsel was given an opportunity to conduct a pretrial interview of Grover. The interview was critical to pin down particulars of the alleged acts, that were not listed in the indictment, and force Grover to choose a single story. Though attorney Davis was not responsible for the substance of the case, and admittedly felt unprepared, Koch sent him to the interview, alone. (Exh. U) Davis could not explore Grover's claims in any detail. Questions about abuse are found on five transcript pages, with vague answers about two uncharged acts accusations. (Exh. U, pp. 141-145) The rest of the 170-page interview concerned inessential information about job history, addresses, treatment programs, criminal history, and the like; all of which the defense should have already known by that time. Nothing was gained.

28

The state post conviction relief court added another instance of ineffective assistance. Denying MacRae's claim based on newly discovered evidence of Grover's admissions that MacRae was innocent, the state court wrote that trial counsel could and should have obtained that evidence before trial. If the court is correct, Koch entirely undermined the defense by failing to present to the jury Grover's confessions that he was never molested, his accusations were lies made to get money from the church, and that MacRae is innocent.

In all, counsel did for the state what it could not have done for itself – brought in inadmissible evidence, gave the defense strategy to the state and failed to conduct critical discovery, and failed to present Grover's admissions that MacRae is innocent. A conviction was certain before the first witness took the stand.

### Uncharged Acts Testimony

Prior to trial, the trial court ruled that Grover's accusations of uncharged acts were inadmissible. That was a critical victory for the defense. Nevertheless, in his opening argument, Koch commented that the accusations did not make sense because at the time they were to have occurred, Grover was too big and strong for MacRae to have first initiated sexual contact. (T. 1/52, 59) Koch misrepresented the facts. Uncharged accusations included stories of abuse occurring before the charged acts, when Grover was younger. To cure Koch's blunder, the court reversed its order and allowed the admission of Grover's uncharged acts claims.

In the first uncharged story, Grover said that as he and MacRae walked through the rectory hallway, MacRae forced him up against the wall, strangled him, "grabbed my crotch area and was grinding his body up against my side." (T. 2/30) That was the only claim of violence in the case. The two other prior acts stories are about car rides in which MacRae, while driving, fondled Grover, in

29

the seat next to him. (T. 2/37-41; T. 4/66-76) Both stories avoid the charged acts problem of people nearby who would have noticed the alleged acts.

### Would-Be "Expert Testimony": Unsupported, Unsupportable, and Inappropriate

Two state witnesses were permitted to offer seemingly expert testimony, though without scientific support.

*McLaughlin*

The state moved to qualify McLaughlin as an expert on "the process in which victims disclose the sexual abuse," and that inconsistencies are "more times than not" seen in true reports. (T. 7/53, 96) The state needed that testimony to overcome Grover's ever changing claims. (T. 7/59, 94-95) The court denied the motion. However, impressed with McLaughlin's claim of having found more than 1,000 "victims of sexual abuse" in 750 cases and some educational credentials, the court permitted him to present the same testimony – as a lay witness. (T. 7/37, 47. 96) Defense counsel did not object.

McLaughlin's testimony had a scientific flavor, but it was rank vouching, bolstering, and justification for Grover's shape-shifting stories. He even told the jury that Grover's inconsistencies are expected of true claims. As if speaking from empirical study, he instructed:

> Most of the adult victims... will basically give you a rough outline of what happened to them.... And then on subsequent interviews, they will come up with additional facts about their victimization.

(T. 7/97-98) McLaughlin testified also that "disclosure" "typically" comes in pieces rather than at once. Simply, McLaughlin told the jury that Grover's piecemeal, inconsistent and varying claims are typical, if not indicia of truth. (T. 7/98) Koch did not object.

30

*Leonard Fleischer*

Psychologist Leonard Fleischer echoed McLaughlin's vouching testimony. He was qualified as "an expert to testify about the characteristics of adults who are victims of child sexual abuse," "in particular, the phenomenon of delayed disclosure." (T. 7/164-165, 172)

Fleischer offered no empirical support for his testimony, as he told the jury:

It is the norm, it is the average situation that this [abuse] is not reported for long periods of time.... It is the exception that child sexual abuse is reported immediately after the actual assault. (T. 7/173)

It would be rare, he said, for a victim to provide a complete description in a first report because "details tend to come out over a period of time." (T/ 7/185)

[T]o basically underline the point that we've been talking about that not disclosing is normal. Disclosing right away is abnormal, is unusual.... (T. 7/193)

Though he avoided Grover's name, the jury could take from Fleischer's testimony what it got from McLaughlin before him: Grover's accusations – not reported for a long time and in bits of changing pieces – bear the characteristics of true accusations.

McLaughlin's and Fleischer's testimony was nothing but rank vouching. And it was baseless. While some abused children have been observed to delay reporting, there is no support for the notion that prompt and complete reports are suspect or that a reporting delay has any bearing on truth. Defense counsel did not object to so much bolstering and vouching testimony.[14]

8.    The Verdict

Grover's perjury admissions and his conceded get-rich-quick scheme were unknown at trial.

---

[14]London, K., Bruck, M., & Ceci, S.J., & Shuman, D.W. (2005). Disclosure of child sexual abuse: What does the research tell us about the ways that children tell?. Psychology, Public Policy and the Law, 11, 194-226; London,, Bruck, Wright, & Ceci (2008) A Review of the contemporary literature on how children report sexual abuse: Findings, methodological issues. Memory, 16, 29-47.

Koch aided and abetted the state in so many critical ways. Particularly in the social climate of the day, it is no wonder that the jury bought it all. After fewer than six hours of deliberation, the jury convicted MacRae on all five charged counts. (T. 10/ 12-13)

     9.     <u>Post Trial Proceedings</u>

MacRae's direct appeal was denied on June 6, 1996.

On April 24, 2012, MacRae filed a Motion for a New Trial in New Hampshire Superior Court. The issues raised were ineffective assistance of counsel and newly discovered evidence – statements from Grover's family and friends that document his admissions of perjury and motivations for it. That evidence was collected pursuant to more than a decade of efforts by MacRae from his prison cell, first without money or assistance, and finally with the help of counsel and an experienced investigator.

The state court bifurcated the petition, considering one issue at a time, without a hearing on either, and denied both in separate opinions on March 15, 2013 and July 9, 2013.[15]

On August 12, 2013, MacRae filed a Notice of Discretionary Appeal, seeking leave to appeal to the New Hampshire Supreme Court. That request was denied on September 26, 2013.

This petition for habeas corpus follows.

STANDARD OF REVIEW

MacRae is in the custody of the State of New Hampshire in violation of the Constitution of the United States. He seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (a). The writ

---

[15]The state court bifurcated MacRae's post conviction arguments – considering and deciding separately the ineffective assistance of counsel and newly discovered evidence issues. "IAC" citations refer to the ineffective assistance of counsel decision handed down on March 15, 2013. "NDE" citations refer to the newly discovered evidence decision, dated July 9, 2013.

32

"stands as a safeguard against imprisonment of those held in violation of the law," and this Court

must be "vigilant and independent" in reviewing MacRae's petition. *Harrington v. Richter*, 131 S.

Ct. 770, 781 (2011).

> Federal habeas corpus relief may be granted in cases in which the state court adjudication:
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;
>
> or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established federal law if the state court (1)

arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; and

(2) confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and

reaches an opposite result. A state court's decision is an "unreasonable application" of federal law

if the state court "unreasonably applies the correct legal rule to the particular facts, unreasonably

extends a legal principle to a new context, or unreasonably refuses to extend the principle to a new

context where it should apply."

If in its search for constitutional error, the habeas court finds the state court's application

of federal law objectively unreasonable, the habeas court has a duty to correct it. *Lambert v.

Beard*, 633 F.3d 126, 133 (3d Cir. 2011).

A court may also grant habeas relief if a state court's decision involved an unreasonable

determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2). To assess

the reasonableness of a state court's determination of the facts, a federal court must determine

whether the state court factual findings are supported by sufficient evidence. *Miller-El v. Cockrell*, 537 U.S. 322, 340-41 (2003); see *Beck v. Bowersox*, 257 F.3d 900, 901 (8 Cir. 2001) (stating that sections 2254(d)(2) and (e)(1) "require meaningful federal court review of the evidentiary record considered by the state courts"). Relief should be granted when the state court decision is based on factual determinations that are inconsistent with, or not supported by the evidence presented in the state court. *See, Miller-El v. Dretke*, 545 U.S. 231, 266 (2005) (granting relief in a section 2254(d)(2) case); *Yung v. Walker*, 296 F.3d 129, 136 (2d Cir. 2002) ("The focus of [section] 2254(d)(2)" is "on whether the [state] court's factual findings are supported by sufficient evidence.").

Further, when a state court did not adjudicate the merits of a claim, because it either misunderstood the claim, failed to reach certain elements of the claim, or completely failed to address the merits of a claim, a federal court employs the standard of *de novo* plenary review of legal and mixed legal-factual findings. 28 U.S.C. § 2254(d); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) ("Because the state courts...never reached the issue of prejudice...we examine this element of the *Strickland* claim *de novo*"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)("our review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis."). A state court decision is "adjudicated on the merits" if it "1) finally resolves the claim, and 2) resolves the claim on the basis of its substance, rather than on a procedural, or other, ground." *Thomas v. Horn*, 570 F.3d 105, 115 (3 Cir. 2009), *cert. denied*, 130 S. Ct. 1879 (2010) and *cert. denied*, 130 S. Ct. 1942 (2010); see *Appel v. Horn*, 250 F.3d 203, 210 (3 Cir. 2001)("[w]hen, although properly preserved by the defendant, the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential

34

standards provided by AEDPA...do not apply.").

The state court decision in MacRae's case is the product of both its unreasonable application of settled federal law and its unreasonable determinations of the facts. Concerning MacRae's showing of ineffective assistance of counsel, the state court failed to adjudicate the merits of a critical element of the claim – indeed, one that the court identified on its own and then failed to address.

TIMELINESS OF PETITION

This petition is filed within one year of the collection of sufficient newly discovered evidence to support MacRae's petition – less the time period that his state court post-conviction petition, which was properly filed, was pending in court. Thus it is filed within the time limits of 28 U.S.C. § 2254 motions.

The newly discovered evidence, collected during a years-long investigation that ranged over several states is critical to MacRae's ineffective assistance claim, not only because it was the only means through which a horrible failure of defense counsel could have been discovered – Grover's admissions that MacRae was innocent – but also because it illuminates the prejudice caused by each instance of counsel's deficient conduct, as MacRae's Sixth Amendment right to counsel was stripped from him. *Strickland v. Washington*, 466 U.S. 668 (1984).

The newly discovered evidence also proves MacRae's innocence. Grover admitted that his claims were nothing but lies. MacRae did nothing to him. In light of that evidence – supported by contemporaneous objective evidence – no reasonable juror could have convicted MacRae. Because MacRae's newly discovered evidence proves he is actually innocent, it would constitute a grave miscarriage of justice should he be time-barred from review of his federal constitutional claims.

Accordingly, that actual innocence overcomes any time bars that might be alleged. *McQuiggen v. Perkins*, __ U.S. __, 133 S. Ct. 1924 (2013); *Schlup v. Delo*, 513 U.S. 298 (1995).

For those reasons, the petition is properly before this Court.

CLAIMS FOR RELIEF AND SUPPORTING ARGUMENT

SUMMARY OF ARGUMENT

This petition is based on newly-discovered evidence that MacRae is innocent and that his trial attorney rendered constitutionally inadequate assistance of counsel, resulting in such substantial prejudice that confidence in the outcome of trial is significantly undermined. *Strickland v. Washington*, 466 U.S. 668 (1984).

The state court found trial counsel's performance in opening the door to uncharged acts at the start of trial was not a strategy – thus deficient. The state court also found counsel's failure to object to expert testimony being given by a lay witness constituted deficient performance, and that this failure was not based on any reasonable strategy. The state court unreasonably found, however, that neither instance of deficient performance prejudiced MacRae. Moreover, the state court failed to consider the ineffective assistance claim cumulatively, as is required by *Strickland*. The court did not consider the cumulative effect of all of the instances of ineffective assistance presented to it. Nor did it consider the aggregate prejudice caused by counsel's failures. The court also failed to consider all of the ways the trial would have been different absent counsel's deficient conduct and the prejudice that resulted from it. Cumulative review is critical and required by settled Supreme Court law. *Strickland*, 466 U.S. at 690, 694; *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith,* 539 U.S. 510, 536 (2003). Thus, the state court's process undermines its ultimate decision.

The state court additionally unreasonably failed to find trial counsel's performance deficient

36

when counsel provided the defense case to the state prior to trial and failed to conduct discovery – specifically, to take advantage of an opportunity to interview Grover before trial. No reasonable defense attorney would have acted in this manner. Counsel's deficiencies in these regards are particularly impressive when this conduct is viewed (as it properly should have been) in conjunction with counsel's other deficient performance. The trial court did not conduct that proper review, however, choosing instead to review the instances of ineffective assistance "item-by-item" as the Supreme Court has prohibited. *Strickland* 466 U.S. 688-689, 695-696.

MacRae has presented newly discovered evidence that Grover, the sole source of the incriminating evidence, told family and friends that the accusations were nothing but lies. The state court found that trial counsel could have discovered this evidence of MacRae's innocence during pre-trial investigation, but failed to conduct that critical investigation. The failure to obtain available exculpatory evidence – particularly the complainant's confession that the defendant is innocent – can only be regarded as deficient performance. *Williams v. Smith, supra*; *Wiggins v. Smith, supra*. This evidence would have demonstrated Petitioner's actual innocence and would have destroyed Grover's credibility. No reasonable jury would have convicted Petitioner had trial counsel investigated and presented this evidence.

Though it identified the claim, however, the state court chose to ignore it, rather than consider its merits individually and cumulatively with the other instances of ineffective assistance presented, as is required by *Strickland* and its progeny. Thus, this Court should defer to the state court finding that trial counsel should have investigated and found this evidence pre-trial, and should then review the entire ineffectiveness claim *de novo* and grant habeas relief.

Moreover, MacRae is actually innocent, as the newly discovered evidence introduced in state

court demonstrates. That actual innocence serves as a gateway through which his ineffectiveness claims should be reviewed, even if they would otherwise be deemed untimely or procedurally barred for any other reasons.

Finally, Petitioner should be granted habeas relief because he is actually innocent. The Fourth, Fifth, Sixth, Seventh, Eighth, and Fourteenth Amendments to the United States Constitution are designed, *inter alia*, to protect an innocent person against an abuse of power by a prosecuting authority that could result in undeserved punishment. Such punishment of an innocent person must, therefore, constitute a violation of his or her due process rights. Petitioner realizes that this due process right has not yet been recognized by the United States Supreme Court, but asserts his right to its protection, which he believes will be recognized in the future.

I.   MacRAE WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE HIS TRIAL COUNSEL: A) OPENED THE DOOR TO POWERFUL, OTHERWISE SUPPRESSED, "UNCHARGED ACTS" EVIDENCE, B) FAILED TO INVESTIGATE AND OBTAIN AVAILABLE EVIDENCE OF GROVER'S ADMISSIONS THAT MacRAE IS INNOCENT, C) PROVIDED THE STATE WITH THE DEFENSE CASE BEFORE TRIAL, D) FAILED TO OBJECT TO "EXPERT" TESTIMONY, AND E) FAILED TO CONDUCT CRITICAL DISCOVERY

A.     **Introduction: Counsel's Conduct Assured MacRae's Conviction**

In the most critical respects, Koch served the state, doing what it could not do for itself. In his opening argument, defense counsel, Koch, made a single comment that triggered the admission of dramatic and powerful stories of uncharged acts that had been previously suppressed because of their highly prejudicial impact. Thus, Koch loaded the trial with highly prejudicial claims. By failing to object to powerful pseudo-expert testimony, Koch enabled the state to present what could only have seemed to be objective, scientific claims that vouched for Grover's accusations. Koch also handed to the state the entire defense strategy, enabling the prosecution to react to the defense case

before the trial began. Counsel also failed to obtain what the state court found was available evidence of MacRae's innocence, and failed to collect pretrial statements from Grover that would have been critical to lock down Grover's ever shifting accusations and provide cross-examination material. Koch's efforts – and lack thereof – served the state immeasurably.

There is no conceivable strategy for any of Koch's conduct, which was clearly inconsistent with the defense he pursued. Review of Koch's behavior, particularly cumulatively in context of the entire case — which is required by Supreme Court, but avoided by the state court – makes apparent the violation of MacRae's right to counsel, and the wrongful conviction.

The state court failed to adjudicate the entire ineffective assistance of counsel claim presented to it. For what it did consider, the court misapplied the correct constitutional standard, and rendered factual decisions that are wholly unreasonable in light of the record presented to it. Accordingly, habeas relief should be granted.

### B.     Ineffective Assistance of Counsel: Clearly Established Federal Law

The Sixth Amendment to the United States Constitution guarantees every criminal defendant "the effective assistance of counsel – that is, representation that does not fall below an objective standard of reasonableness in light of prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Failure to render adequate legal assistance constitutes a violation of a defendant's right to counsel. *Strickland*, *supra* at 686. A defendant is deprived of his right to counsel when counsel's conduct undermined the proper functioning of the adversarial process and "the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

In *Strickland*, the United States Supreme Court established a two-pronged test for determining whether counsel is ineffective pursuant to the Sixth and Fourteenth Amendments to the

United States Constitution. A defendant has been deprived of the right to effective assistance of counsel when: 1) counsel's performance fell "below an objective standard of reasonableness" – in light of all the circumstances of the case, counsel's "acts or omissions were outside the range of professionally competent assistance"; and 2) counsel's deficient performance prejudiced the defense, by creating a "reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different." *Strickland,* 466 U.S. at 690, 694. The petitioner "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland,* 466 US at 693.

It is critical that a court reviewing an ineffective assistance claim must consider counsel's errors "collectively, not item-by-item." *Strickland,* 466 U.S. at 688-89, 695-696; *Kyles v. Whitley,* 514 U.S. 419, 436 (1995)(identical prejudice standard for ineffective assistance as withholding exculpatory evidence); *United States v. Bagley,* 473 U.S. 667, 682 (1985)(same).

*Strickland* requires that the habeas court review counsel's deficient performance in a cumulative fashion, beginning with the first prong – that deficient performance is an "overall" error – assessing counsel's "overall performance" to determine whether "identified acts and omissions rise to the level of deficient performance." *Strickland*, 466 US 668, 688 (1984). The second, prejudice prong also requires a cumulative analysis. For example, in *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court reversed the circuit court because the circuit court failed to consider all of the ways the trial would have been different but for counsel's mistakes. The totality of trial counsel's deficient performance caused prejudice and established constitutionally ineffective assistance. *Williams*, 529 U.S. at 371, 394. Cumulative review is so critical to assessing ineffective assistance of counsel that it is necessary to evaluate "evidence adduced in...habeas proceedings," in conjunction

40

with  "evidence adduced at trial." *Wiggins v. Smith*, 539 U.S. 510, 536 (2003). The state court unreasonably defied *Strickland* when it considered the instances of Koch's behavior item-by-item and never consider their cumulative effect on the trial.

<u>The State Court Unreasonably Applied *Strickland*</u>

In the following sections, we show the individual reasons for habeas relief based on ineffective assistance and the state court's unreasonable decision concerning this claim. The state court's overarching fatal error, however, infects every component of its decision and must be appreciated from the outset.

The state court did not review the ineffective assistance showing cumulatively, as *Strickland* requires. Instead, it considered each claim item-by-item (expressly contrary to the *Strickand* rule) separate and apart from the others. Concerning the deficient performance prong of *Strickland*, the court did not review Koch's performance as a whole – even when it conceded that he was in fact deficient in individual instances. (IAC, pp. 7 (opening the door to uncharged acts "not part of a calculated risk designed to further a trial strategy"); (failing to object to inadmissible expert testimony "fell below an objective standard of reasonableness"); NDE, p. 38 (new witnesses with evidence of Grover's admissions that MacRae is innocent were available at trial "and counsel should have interviewed them...[and was] somewhat at fault for the failure to discover this evidence at the time of trial")) By considering instances individually, the court did not consider that the sheer number and magnitude of Koch's failures revealed the deficiencies that characterized his behavior throughout. Indeed, by separating out and then rejecting each instance of conduct item-by-item, the state court never saw the magnitude of Koch's conduct.

Likewise, the state court never considered prejudice cumulatively or review it in light of the inherent weakness of the state's case, which consisted solely of Grover's uncorroborated claims.

Operating item-by-item, the court never considered, as *Strickland* requires, how the trial would have been different without Koch: opening the door to so much uncharged acts testimony (after first getting it all suppressed); failing to object to expert testimony that would have been excludable and that undermined the defense strategy; providing the defense strategy to the state before trial (including revealing client and witnesses' statements); failing to conduct discovery that would have (according to the state court) obtained statements from Grover's relatives and friends documenting Grover's admissions that his accusations were lies; and failing to interview Grover to lock down his accusations before trial.

*Strickland* is intended to make sure that review of ineffective assistance claims encompasses the entire trial. The state court's review of MacRae's petition was precisely the opposite of *Strickland*'s requirements and, as such, was an unreasonable application of federal law that requires habeas review and relief. 28 USC § 2254(d).

<u>The State Court Made Unreasonable Fact Determinations</u>

The state court's determination of facts are contrary to the record. Time and again, the court's summary conclusions that Koch's serial errors were strategy are contradicted by the record. Assumptions of fact that are so directly contrary to the record are unreasonably determined and warrant relief. 28 U.S.C. § 2254(d).

**C.    Koch Facilitated the Admission of Dramatic Stories of Uncharged Acts, Furnished the State With Documents Containing the Defense Strategy, Failed to Object to Expert Testimony, and Refused to Conduct Meaningful Discovery**

<u>1.    Koch Assured MacRae's Conviction By Enabling the State to Present Highly Prejudicial "Uncharged Acts" Accusations That Had Previously Been Suppressed</u>

*a.    Introduction*

Pre-trial, as a result of defense efforts, the state court properly excluded several of Grover's stories of highly prejudicial uncharged acts. (T. 1/9-10) The exclusion was extraordinarily important

to the defense. The stories would have nearly doubled the number of accusations that the jury would hear. They were also more dramatic and sympathy-evoking than the charged acts. The uncharged accusations concerned violence against a much younger, smaller, and more vulnerable Grover than the charged accusations, which consisted of non-violent acts against the older, confirmed criminal, substance-abusing, larger and more powerful man that Grover had come to be. The only violence alleged in this case was in the uncharged acts. The uncharged acts claims were also impossible to defend against. They were to have occurred much farther in the past than the charged acts and in isolated settings without people nearby. It was impossible for MacRae to locate documents, witnesses, and other materials necessary to defend against them.

Excluding the uncharged acts might have been the single greatest advantage that could be realized by the defense. Yet, as soon as the trial began, Koch made a comment that opened the door for all of those uncharged acts stories. In his opening argument, Koch told the jury that the first charged allegation was unbelievable because in 1983 (when it was to have occurred), Grover was a "big," "aggressive, violent and hostile," "strong young man." It was impossible, Koch said, that "MacRae... out of the clear blue, unzips [Grover's] pants and fellates him, [w]ith no other explanation or description or anything else."  (T. 1/ 52, 59) He entirely misrepresented the facts.

Koch knew that the first charged act was not the first chronological act that Grover alleged occurred. The excluded uncharged acts stories alleged acts that were to have occurred prior to the first charged act. Thus, the first charged act was not "out of the clear blue" against a grown and strong Grover. The trial court corrected Koch's misrepresentation by admitting all of the uncharged acts stories that it had previously excluded. (T. 1/61-1/65; T. 2/3-6) Thus, Koch accomplished what the state tried but could not do for itself. He loaded the trial with uncharged acts claims.

43

Koch wrecked the defense. The state used the uncharged acts testimony throughout the trial, from the first witness to the last. Grover told his uncharged acts stories. (T. 2/28-41) They were repeated by McLaughlin, (T. 7/39-43) reinforced by Ms. Grover, (T. 6/60-62), and retold by brother Jon Grover. (T. 7/20-21) In addition to the direct damage to the defense, Koch destroyed his own credibility with the defense from the start.

The state court found Koch's performance to be deficient, properly concluding that opening the door to these uncharged acts was "not part of a calculated risk designed to further a trial strategy." Nevertheless, the state court found no prejudice. The trial court erred as a matter of fact and law.

b.   *The Uncharged Acts Stories*

The first uncharged act story was of a day in 1979 when Grover was 11 years old, delivering a newspaper to the rectory. Grover told the jury that MacRae violently assaulted him:

> ...I went inside and had, uhm, a donut and something to drink and went into the other front room of the rectory... as we were walking down the hallway, MacRae was behind me at first and came and slowly pushed me towards – not pushed me but moved his body so I went towards the wall and just before we got to the door he put – pushed me up against the wall. I had my paper bag in front of me and he pushed his weight up against me and put his arm up under my throat.
>
> He grabbed – took his hand and grabbed my crotch area and was grinding his body up against my side.... I tried to move away and he pushed his weight up against me and was grinding his lower half against my body....
>
> He was a lot bigger than I was at the time. So it was easy for him to put his weight and pin me and the way he had his arm against my – across my throat area, I moved – I couldn't move backwards and I couldn't move... he pushed – pushed me to the side like that and I turned like this and he came up and I slid on the wall a little bit and before he fully caught his arm against my throat area.

(T. 2/28-2/32)

44

Grover's second uncharged act story was about a 1981 car ride.

> It was night time and late and I fell asleep in the front of the car and when I woke up, uhm, Gordon MacRae had his hand on my pants and was fondling me... I just woke up real quick and pulled back as close to the door as I could. I stayed awake the rest of the way and didn't say anything to him.

(T. 2/36-39)

The third story was another car ride that year.

> I went with him to get some food in Keene and on the way there he again pinned me – he fondled me through my pants....

> He just took his arm and pushed like that and then grabbed at my crotch area with his hand and was feeling through my pants....

(T. 2/40)

The charged acts could be challenged by objective evidence that contradicted Grover's claims. Non-functioning door locks and a non-existent chess set, as well as evidence of people present just feet from Grover's alleged crime scenes undermined his claims. (*Supra*, 15-18)  The uncharged acts stories, however, were impossible to confront. In them, Grover portrayed himself as a defenseless child, violently assaulted, strangled, and molested in isolated places. That they were to have occurred so far in the past made it impossible even to attempt to find evidence to confront them.

The trial court's pretrial order excluding even a mention of the uncharged acts stories evidences the court's recognition of the need to protect MacRae from such unduly prejudicial claims. Koch's comment entirely undermined the court's efforts. By facilitating the admission of the uncharged acts claims, Koch built a prosecution against which there was no defense.

45

c.    *Causing Admission of the Other Acts Evidence Was Not Competent Assistance By Any Standard*

It is universal. The defense objective is to limit the admission of harmful evidence and confront that which is admitted. It is never within any "objective standard of reasonableness" for defense counsel to introduce harmful evidence against the defendant. That would be so far from even the broadest "range of professionally competent assistance" that it would raise questions of rationality and competence, not reasonableness. *Strickland*, 466 US at 690, 694.

Tripping the admission of the uncharged acts stories was not a strategy and the state court so found. (IAC, p. 7) Koch never understood what he did wrong. When his comment was brought to his attention, Koch argued that he had not opened the door because opening arguments are not evidence, and then because his comment merely repeated the prosecutor's opening statement – which it did not. (T. 1/62-63) Neither statement suggests a strategy. Koch thoughtlessly blathered his way into introducing the uncharged acts stories and assuring the conviction – without reason or strategy. Witless behavior is not a plan. Even if Koch's actions might be labeled an attempt at strategy, opening the door to so much otherwise inadmissible evidence is so self-destructive that it could not overcome an ineffective assistance claim.

For example, in *Fisher v. Gibson*, 282 F.3d 1283 (10 Cir. 2002), counsel was ineffective for, in part, opening the door to damaging evidence from the crime scene. The circuit court allowed "much scope" to counsel's tactics, yet granted a writ of habeas corpus because there was no reason for the tactic. Ineffective assistance was found in *United States v. Villapardo*, 259 F.2d 934 (8 Cir. 2001) because counsel elicited testimony about threats and admissions made by the defendant – that could not be justified as strategy. *Id.* at 939. In *United States v. Russell*, 221 F.3d 615 (4 Cir. 2000)

46

defense counsel failed to move to exclude reference to prior convictions. Because the case turned on credibility and the government's evidence was marginal, defendant's claim of ineffective assistance was established. In *Miller v. Anderson*, 255 F.3d 455 (7 Cir.), *vac'd on other grounds*, 268 F.3d 485 (7 Cir. 2001), counsel was ineffective because his examination of an expert opened the door to cross-examination about defendant's prior convictions. Likewise, in *Berryman v. Morton*, 100 F.3d 1089 (3 Cir. 1996), defense counsel's questions of an investigator opened the door to an inference of other crimes. The court presumed that counsel's questions were strategic, yet granted the writ. In *Freeman v. Class*, 95 F.3d 639 (8 Cir. 1996), counsel introduced a police report containing prejudicial hearsay and failed to request a limiting instruction concerning testimony. Even though the hearsay might otherwise have been admissible, the court – noting that there could be no reasonable strategy for counsel's actions – granted the writ. And, in *Ward v. United States*, 995 F.2d 1317 (6 Cir. 1993), counsel was constitutionally ineffective for intentionally asking a cross-examination question that opened the door to evidence of defendant's character.[16]

As in those cases, Koch bolstered the state's case with claims that were so powerfully prejudicial the trial court had suppressed them. Further, prejudice here is far greater than in those cases in which evidence triggered by counsel was limited. Here, the uncharged acts claims polluted MacRae's entire trial, from the opening witness through closing statements. Nothing in the record or reason suggests that such wholesale ruin was a strategy. It was a singular, unknowing, and unintentional comment that infected the entire trial. (T. 1/62-63)

---

[16]In cases in which opening the door to evidence has not been deemed deficient conduct, the state's other evidence is substantial. *E.g.*, *Harding v. Sterns*, 380 F.3d 1034 (7 Cir. 2004) (mention of prior convictions harmless due to substantial direct evidence); *United States v. LaPlante,* 714 F.3d 641 (1 Cir. 2013)(mention of civil default, harmless given weight of direct evidence). Here, the state had nothing but Grover's stories – which were undermined by objective facts. (*Supra*, pp. 15-18)

d.      *The Prejudice Caused by Defense Counsel's Actions is Enormous and Obvious*

The prejudice of introducing so much critical and dramatic prosecution evidence is obvious. That is why the state wanted to introduce it in the first place – and why the trial court excluded it. Koch converted a significant defense advantage (suppression of the uncharged acts stories) to a powerful state weapon (prosecution by uncharged acts stories).

When a defense attorney does not subject the state's case to meaningful and adversarial testing, prejudice is presumed. *United States v. Cronic*, 466 U.S. 648, 659 (1984). Koch did not test the state's case. He enhanced it. He undermined the adversarial process to the point at which the trial cannot be relied on as having produced a just result. *Miller v. Anderson*, 255 F.3d 455 (7 Cir.), *vac'd on other grounds*, 268 F.3d 485 (7 Cir. 2001)(open the door to prior convictions); *Berryman v. Morton*, *supra* (opened door to other crimes inference); *Freeman v. Class*, *supra* (opened door to hearsay).

The prejudice inflicted on MacRae by Koch's actions includes:

•       The sheer weight of the uncharged acts stories crushed the defense. Nearly doubling the accusations, those stories were a feature of the trial, pressed on the jury from start to finish.

•       The uncharged acts stories included the only claim of violence – against a small child, at that. Thus, they were far more prejudicial than the claims of non-violent behavior against a grown and physically dominant Grover.

•       The indictment provided no notice of times, dates, weeks, or months for the charged acts and made difficult enough the task of collecting material to confront claims or mount a defense. Trying to mount a defense against stories of uncharged acts alleged to have occurred so much farther into the past was impossible.

48

- By mischaracterizing the evidence at the very beginning of trial, Koch undermined his own trustworthiness, making it that much more difficult to have the jury view the defense as credible.

Opening the door to so much uncharged acts testimony, Koch ensured a conviction.

e. *The State Court's Denial of MacRae's Ineffective Assistance Claim Based On the Uncharged Accusations is Based on an Unreasonable Application of Established Federal Law and Unreasonable Determinations of Facts*

The state court recognized that Koch's conduct that opened the door to Grover's uncharged acts claims was "not part of a calculated risk designed to further a strategy." (IAC, p. 7) Nevertheless, it preserved the conviction, relying on speculation that is contrary to the record, and conflicts with a constitutional ineffective assistance analysis.

An Unreasonable Application of Established Federal Law

The proper application of the law concerning ineffective assistance of counsel requires that the instances of counsel's conduct be considered "collectively, not item-by-item." *Kyles v. Whitley*, 514 U.S. at 436. (*Supra*, pp. 39-40) The state court violated that requirement. According to its improper "item-by-item" review, the state court never considered this instance of ineffective assistance – neither the deficient conduct or prejudice – in the aggregate with the others presented. Accordingly, the state court's analysis defied constitutional muster. *Strickland v. Washington*, 466 US at 688-689. Its decision involved an unreasonable application of clearly established constitutional law and cannot stand. 28 U.S.C. § 2254 (d).

An Unreasonable Determination of Facts

The state court "assume[d]" that Koch's statement that opened the door to the uncharged

evidence was not part of a trial strategy.[17] (IAC, p. 7) Accordingly, MacRae has satisfied the first, deficient performance, *Strickand* prong. Thus, the court's rejection of this aspect of the ineffective assistance must have been based on a finding a lack of prejudice. That conclusion is contrary to the record. The court did not recognize the extraordinary prejudice because of the improper item-by-item analysis that it employed. The court's decision concerning prejudice is also the result of its unreasonable determinations of fact that are contrary to the record. Specifically:

●      The state court wrote that it would have been impossible for Koch to try to impeach Grover without opening the door to the uncharged acts. It was "inevitable," according to the state court. (IAC, p. 7-9) The record expressly undermines that conclusion.

The defense to Grover's charged acts claims was unrelated to the uncharged allegations. Koch's strategy to confront Grover was to reveal Grover's changing stories, present evidence that disproved them (*i.e.* inoperable locks, non-existent chess sets, people present), and reveal his criminality, and substance abuse. (*Supra*, pp. 5-15) It was a defense based on references to objective facts. None of that involved the uncharged acts claims.

Koch's opening statement comment was entirely different. Essentially, he asked the jury to take his word for the assertion that Grover was too big to be molested. That was the only subjective moment of the defense – and totally contrary to the rest of the defense strategy. The state court offered no basis for its assertion that Koch's comment was necessary to (or part of) the defense strategy – let alone why it was "inevitable" that any impeachment would bring in the uncharged acts. The court's conclusion in that regard was pure speculation, and contradicted by the record.

●      The state court wrote that Koch anticipated triggering the uncharged acts testimony

---

[17]Contrarily, the state court also attributed Koch's comment to strategy. (IAC, pp. 8-9)

because Koch "was prepared" to cross-examine Grover about them – after he had opened the door and they were admitted. (IAC, p. 9) The record belies that finding.

**First**, Koch was totally surprised and confused when he was told that his comment triggered the uncharged acts evidence. He did not even understand what he had done wrong. He had no idea that his comment would reverse his hard-won and critical exclusion order. (*Supra*, pp. 46) The record supports nothing but that his comment was a horrible accident. Indeed, the sate court recognized that it was "not part of a calculated risk designed to further a trial strategy." (IAC, p. 7)

**Second**, the uncharged acts claims were not suppressed until just before trial. For the purpose of making his exclusion motion, and because he did not know whether it would be granted, Koch had to prepare as best he could to defend against the uncharged acts claims. Preparation of a defense is not indicative of a strategy to provoke a worst case scenario. Again, the state court recognized the absence of strategy in this regard. Thus, its notion that Koch anticipated admission of the uncharged acts evidence – and that his anticipation somehow eliminated or diminished the prejudice is unreasonable.

**Third**, Koch's opening comment was inconsistent with the strategy evident in the remainder of the defense. Impeachment of Grover throughout the trial was based on inarguable documented facts: Grover the liar, addict, and criminal, whose accusations changed opportunistically, and objective circumstances including non-existent chess sets, doors with windows in them that do not lock, and people within hearing distance. (*Supra*, pp. 5-19) Koch's opening statement comment, a blanket subjective plea for the jury to agree that MacRae simply could not have molested Grover is of a totally different character. Koch's comment was so far from his strategy and other actions that it could not have been intended, or its result anticipated.

In fact, by directing the jury away from the objective character of the defense, Koch undermined the real defense strategy. His comment urged the jury to believe that the charged acts were by no means possible because Grover was grown at the time they occurred. Of course, the charged acts were literally possible. Defense counsel's comment was a patently ridiculous assertion that steered the jury away from the objective evidence that undermined Grover's credibility. The prejudice of that alone is considerable.

Worse, is the way Koch's comment was answered by the uncharged acts evidence. He told the jury that Grover could not have been molested because he was too old and too big. In response came the uncharged acts accusations – of abuse against a young and small Grover. In the context of that evidence, Koch appeared to be a liar – additionally prejudicing the defense case. Moreover, Koch's challenge – that it was physically impossible for MacRae to have molested the adult Grover – was destroyed with the images of a younger, smaller, and more vulnerable Grover.

For these reasons, *Strickand*'s prejudice prong is satisfied as well.

The state court recognized the absence of strategy. Its prejudice conclusion, however, is critically flawed. Rather than analyze, cumulatively,  all of the prejudicial effects of the uncharged acts evidence on the entirety of the trial – and consider all of the ways the trial would have been different without it all of the instances presented) – the state court offered summary conclusions about defense intentions and claims of inevitability that are wholly unsupported and contradicted by the record.

The prejudice so much uncharged acts testimony presented across the trial completely undermined the reliability of the verdict. *Strickland*, *supra*. The state court unreasonably justified it all, without basis in the record. For these actions alone, the conviction cannot stand. The writ should be granted.

52

  2.      Counsel Failed to Obtain Evidence of Grover's Confessions that His Accusations
          Were Lies and MacRae Is Innocent

    The state court identified another instance of Koch's substandard conduct. The state court

wrote that the new evidence of Grover's admissions that the accusations were all lies "is not new."

Because the newly discovered evidence witnesses "were present" during the investigation and trial,

the state court wrote, they were "available." (NDE, p. 4-5) Thus, according to the state court, Koch

failed to conduct the investigation that would have obtained this evidence for trial. That is a fatal

failure. Trial counsel has a duty to make reasonable investigations. Further, the failure to uncover

mitigating evidence is not a strategy. It is ineffective conduct. *Wiggins v. Smith*, 539 U.S. 510

(2003); *Williams v. Taylor*, 529 U.S. 362 (2000).[18] Thus, by the state court's standard and definition,

Koch's failure to contact the new evidence witnesses constitutes deficient performance required by

*Strickland*.

    This instance of Koch's ineffective behavior requires habeas *de novo* review and relief for

several reasons. **First**, the court never adjudicated the merits of this element of MacRae's ineffective

assistance claim concerning this failure by Koch. Federal habeas review is appropriate when the state

court fails to consider the merits of an issue presented. For example, in *Rompilla v. Beard*, 545 U.S.

374, 390 (2005) and *Wiggins v. Smith*, 539 U.S. 510 (2003), *de novo* review was required of the

federal court because the state courts never considered the second, prejudice *Strickland* prong. Here,

the state court identified the issue – and pointed out Koch's failure to investigate and obtain the

exculpatory evidence. Yet, it did not at all analyze Koch's failure according to *Strickland* or any

---

    [18]This instance of ineffective assistance of counsel could not have been discovered until
the newly discovered evidence investigation was complete. Otherwise, it was impossible to know
what favorable evidence Koch failed to obtain, or even that there was any evidence available to
him that he failed to obtain.

context of ineffective assistance of counsel – let alone consider the prejudice of Koch's failure to obtain and present the evidence from Grover's friends and family of his admissions that the accusations were all lies. In fact, once the state court rejected the new evidence with the notion that Koch was at fault for not discovering it, the state court abandoned the matter entirely. To the court, that finding was unimportant for any reason but to deny relief.

**Second**, the court never considered this failure in the context of the rest of Koch's deficient conduct. Pursuant to *Strickland*, having identified this instance of ineffective assistance, the state court was required to consider it cumulatively with the other instances and determine all the ways the trial would have been different had Grover's family and friends told the jury about his multiple admissions that all of his accusations were lies and that MacRae was innocent. *Williams v. Taylor*, 529 U.S. 362 (2000)(reversing denial of habeas for ineffective assistance when lower court did not consider all ways trial would have been different absent counsel's mistakes). The state court failed to do that. Again, habeas relief is warranted.

There cannot be a greater example of ineffective assistance than trial counsel failing to obtain available statements from a complainant that his accusations were a hoax and that the defendant is innocent. No reasonable standard can be stretched to condone such a failure. With that evidence there would have been no conviction. It is hard to imagine that there would have been a prosecution, had the state been aware of Grover's perjury admissions.

The prejudice of Koch's failure to obtain and present to the jury Grover's admissions that MacRae is innocent is overwhelming, by any measure. Habeas relief is necessary.

54

3.    Koch Undermined any Opportunity to Confront the State's Case by Providing the
      State with the Defense Theory and Strategies Before Trial

a.    *Koch Provided the State With the Defense Case*

Before trial, the state provided the defense with discovery material. To help prepare the

defense strategy, MacRae himself annotated those documents with his impressions, strategic notes

and personal statements. All of that annotated material – the entire defense strategy – was then

delivered to the state. (Exh. M; T. 7/99-103) Koch also gave to the state the list of potential defense

witnesses, and preliminary interviews of those witnesses – in the form of defense questionnaires that

had been completed by the potential witnesses. (Exh. M) Little of the defense was not given to the

state before trial.

Handing the defense case to the state is so far outside any "standard of reasonableness" or

"range of professionally competent assistance," that subtle questions of reasonableness or strategy

are irrelevant. As for prejudice, giving the state the opportunity to react to the defense before trial

destroyed the constitutional guarantee of confrontation. With the defense strategy in hand, the state

was able to avoid whatever plans of "adversarial testing" Koch might have made. Simply, Koch

neutralized the defense – without which, a conviction was guaranteed.

b.    *The State Court's Denial of the Ineffective Assistance Claim Concerning Giving
      Away the Defense Case is Based on an Unreasonable Application of Established
      Federal Law and Unreasonable Determinations of Facts*

Again, the state court denied this claim in isolation, violating the *Strickland* requirement of

a cumulative review along with the other instances of ineffective assistance. That unreasonable

application of federal law warrants habeas relief. 28 U.S.C. § 2254 (d).

- Denying this claim, the state court offered that Koch could have done worse. (IAC,

55

p. 11) That cynical justification does not excuse the damage actually done by Koch, who undermined any opportunity to mount an effective defense or challenge the state's case.[19]

●     The court offered "explanations as to why providing the state with copies of its own discovery with MacRae's annotations was part of the defense strategy." (IAC, p. 11) The court took those "explanations" from recent statements made by local trial counsel J.R. Davis, who had been retained at trial solely to provide assistance to Koch, concerning local rules and procedures. (*Supra*, p. 27) In response to the state's interrogatories related to the state court petition, Davis offered some reasons why discovery might have been given to the prosecution. The objective record belies his memory of events occurring a decade and a half ago. The court's "explanations" included:

1.     Giving away the defense was a sound strategy to "formulate[] and substantiate[] an alibi defense." (IAC, p. 11) Nothing supports this supposition. There was no need to give the state the defense strategy, witness list, and witnesses statements to form an alibi defense.

2.     Supplying the state with the defense case would "set[] up an argument for fundamental unfairness in defending allegations from unknown dates from ten years prior." (IAC, p. 11) That makes no sense. That argument is a legal one, made to the trial court based on a vague indictment. In no way does that argument require handing MacRae's notes and statements, witness lists and statements, and the rest of the defense strategy to the state. Indeed, none of that is even relevant to such an argument. The state court did not suggest that it might be.

3.     Handing over the defense was necessary for Koch to argue that there was a "fundamental unfairness in defending allegations from unknown dates" and "set[] things up for a bill

---

[19]In fact, Koch did do worse. But by considering the claims serially, the cumulative effects of Koch's behavior was not brought to bear on the analysis of the petition.

of particulars." (IAC, p. 11) Those are legal arguments made to the court. They do not require giving away the defense. The court did not offer any reason why such a thing might be necessary.

    **4.**    Turning over the defense was a sound strategy because it might have persuaded the state to abort the prosecution. (IAC, p. 11) That the state would abandon a prosecution based on MacRae's assessment of the evidence is ludicrous. In fact, rather than consider abandoning the prosecution, once provided with the defense case, the state used it to attack MacRae – as anyone would have expected. Thus, the record explicitly undermines this "explanation."

    •    The state court found that turning over the defense was strategic because at one point Koch used one of MacRae's annotations to good effect. (IAC, p. 11) The court did not suggest why it might have been necessary to give away the entire defense in order to use a single annotation. There is no reason for that.

    •    The state court wrote that during cross-examination, detective McLaughlin conceded that there were inconsistencies in Grover's stories only because Koch disclosed the entire defense case before trial. (IAC, p. 11) That is wrong. Regardless of when McLaughlin was faced with Grover's inconsistent stories, he would have acknowledged them. The state court's notion that McLaughlin would have denied inconsistencies had he not seen the entire defense case before trial makes no sense – and presumes McLaughlin would have lied had Koch not given away the defense. Nothing supports any of that.

    The state court's analysis is baseless. At every turn, its factual determinations are unreasonable. Its summary conclusions that Koch's actions were strategy are belied by the record. That, and the court's improper item-by-item analysis require review by this Court. 28 U.S.C. § 2254 (d). Counsel's deficient performance and the prejudice resulting therefrom requires relief.

57

4.    Defense Counsel Facilitated the Admission of McLaughlin's Quasi-Expert Testimony that Bolstered the Accusations

The trial court denied the state's motion to qualify detective McLaughlin as an expert witness. But, it permitted him to testify about "the process in which victims disclose sexual abuse," that inconsistencies are found in true accusations "more times than not," and that "a victim just doesn't come out in an interview and tell everything, that this is more a process rather than an event." (T. 7/53) Koch did not object to that testimony. He even agreed with the state that: "I think [McLaughlin] can testify as a lay person for the very things that [the state] wants him to testify to." (T. 7/95) That is wrong.

a.    Though McLaughlin's Was Not Qualified as an Expert Witness, He Was Permitted to Present Expert Testimony

Expert testimony is that which contains specialized knowledge that is not within common knowledge, and which would assist the trier of fact in understanding the evidence or determining a fact at issue. *State v. Cressey*, 137 N.H, 402 (1993); *State v. Martin*, 142 N.H. 63, 65 (1997) (testimony about delayed recantations is expert testimony). Lay testimony must be confined to personal observations that any lay person would be capable of making. New Hampshire Rule of Evidence 701. Defense counsel should have known that.

The state's proffer of McLaughlin described "expert testimony." The prosecutor defined it as "not within the understanding of the average juror," "not within the province of a normal reasonable juror," and "not within the normal province of the jury."[20] (T. 7/59, 94-96) Nevertheless, Koch agreed that McLaughlin's presentation of the evidence should be permitted.

---

[20]For more recent examples of similar expert testimony, *see*, *See*, *e.g.*, *State v. Tierney*, 150 N.H. 339, 348 (2003)(officer's testimony regarding sexual assault case was expert testimony, and erroneously admitted as lay testimony); *State v. Gonzalez*, 159 NH 74, 77 (2003).

b.     *Counsel's Failure to Object to Such Damning Testimony Could Not Have Been Strategy*

The state court recognized that Koch's failure to object to McLaughlin's testimony was deficient performance – finding it "below an objective standard of reasonableness." (IAC, p. 14) That far, the state court was correct. There is no defense strategy that encourages the admission of damning expert testimony. Especially bolstering and vouching testimony  instructing that true accusations have the same characteristics as those made by Grover.

c.     *The Prejudice of McLaughlin's Testimony Was a Critical Part of the Prosecution*

The court's finding that McLaughlin's testimony bore no prejudice, however, is an unreasonable treatment of the evidence.

This case was a credibility contest. There were no witnesses to Grover's claims or physical proof of them. The only seemingly objective corroborative evidence was McLaughlin's "expert" testimony. (T. 7/96) He testified about a degree in psychology, continuing education, publications read, articles written, years of practical experience. An expert would have offered similar credentials. The court never instructed the jury that McLaughlin was a policeman, not an expert. The illusion was complete. The jury was to assume that McLaughlin's claims were scientific and objective.

McLaughlin's vouching testimony – that true claims look like Grover's – which seemed rooted in science, was surely a critical factor in the verdict. That kind of vouching violates Due Process rights. *See*, *Snowden v. Singletary*, 135 F.3d 732 (11 Cir. 1998)(vouching/bolstering testimony improper in state and federal trials). But Koch welcomed it, rather than lodge an objection.

d.     *The State Court's Justification for Rejecting MacRae's Showing Concerning Defense Counsel's Facilitating McLaughlin's Testimony is Unsupported By the Record*

The state court denied this claim in isolation, apart from the other instances of ineffective

59

assistance of counsel. That is contrary to the requirement of *Strickland*, and was thus an unreasonable application of federal law that requires that the writ issue. 28 U.S.C. § 2254 (d).

The state court recognized that Koch's failure to object to McLaughlin's testimony fell below an objective standard of reasonableness. "To provide effective assistance of counsel," the court recognized, "the objection should have been made." (IAC, p. 14) Nevertheless, with reasons belied by the record and logic, the court found a lack of prejudice.

The state court decided that McLaughlin's improper testimony was harmless because: Koch cross-examined him on other areas; another witness offered "the same type of testimony;" and McLaughlin's "expert" claims were not highlighted in the final jury instruction.[21] (IAC, p. 15) The state court offered no authority for its analysis or finding, which is supported by neither law or the facts.

5.     <u>Counsel's Failure to Conduct Important Discovery Undermined the Defense</u>

Before trial, Koch had the opportunity to interview Grover. His frequent additions and alterations to his stories made that interview critical. Each detail locked-in was one Grover could not squirm out of at trial. Koch could also: ferret out critical cross-examination material; provoke impeachment statements; elicit unknown details that would direct him to documents and witnesses;

---

[21]State expert Fleischer injected similar claims about alleged disclosure patterns, but they were not nearly as prejudicial as McLaughlin's presentation. The court did not consider factors that made McLaughlin's testimony far more compelling: 1) McLaughlin had substantial contact with Grover as he collected accusations; 2) Fleischer had no contact; and 3) It was clear that pursuant to his contact with Grover, McLaughlin deemed the accusations to be true and Grover to be credible. Thus, McLaughlin's "expert" testimony was not just a description of disclosure patterns. It was establishing a framework of characteristics of true disclosures, onto which Grover's claims were hung – with the approval of the experienced officer who elicited those claims, and evaluated them to be true (pursuant to his years of experience, 750 cases, 1,000 victims identified, and vast knowledge of behavior patters).

and assess Grover's appearance, conduct, presentation, manner of avoiding questions, weaknesses, and other important information for cross-examination.

None of that happened. Koch was the lead lawyer in the case, responsible for all the substance of the defense. Local counsel, Davis, was limited to advice on rules and procedure. He was not charged with knowing facts of the case. (*Supra*, pp. 27) Nevertheless, Koch sent Davis to conduct the interview. (Exh. U)

Davis recently recalled that, though he had a chance to review the discovery before the interview, he "did not feel adequately prepared to conduct [it]." (IAC, p. 16) It is unreasonable for Koch to send an unprepared lawyer to conduct the most important element of defense preparation.

What was lost is incalculable. Nothing was gained. There was nearly no discussion of accusations. Unprepared, Davis could not ask for details. (Exh. U, pp. 139-142, 144-145)

The state court deemed Koch's failure to conduct the interview a sound strategy. In support, it offered Davis' recent speculation that Koch was not concerned that Davis deemed himself unprepared, without further consideration of whether Koch had an objective basis for believing that Davis was adequately prepared. (IAC, p. 16) That is not a strategic decision. It was a choice not to act, despite having been told that his action was necessary. The state court's justifications for Koch's failures is not supported by the record.

Again, there is no basis for the state court's justification of defense counsel's performance – or lack thereof.

6.   Conclusion

In violation of *Strickland* and its progeny, the state court did not consider cumulatively all of the instances of Koch's ineffective assistance. Nor did the court consider all of the ways the trial

would have been different absent Koch's deficient performance. This was an unreasonable application of federal law. Thus, habeas relief is required.

The state court offered numerous justifications for Koch's actions; offering them as evidence of strategy. Those justifications are unreasonable determinations of the facts, entirely contrary to the record. Relief is required for that reason as well.

      II.      MACRAE IS ENTITLED TO RELIEF BECAUSE HE IS ACTUALLY INNOCENT

### A.    Evidence of Innocence

The statement of facts in this petition reveals MacRae's innocence. The prosecution was weak from the start. The state could develop nothing in favor of the charged acts other than Grover's uncorroborated and unsupported claims. The case was a credibility contest, resting entirely on the words of a confirmed liar, addict, and criminal. Worse, the charged acts were alleged to have occurred in populated places, inside offices from which sound could be heard through closed doors – one of which had a window that looked in from the busy reception area – and included details contradicted by objective evidence. (*Supra*, pp. 15-18) While the uncharged acts were alleged to have occurred in solitude, they were admitted only because of Koch's ineffective assistance. (*Supra*, pp. 42-52) Likewise, though the state managed to bolster its case with expert claims, they were admitted only due to Koch's failures – and his acquiescence to them came with the failure to show that they are scientifically unsupported. (*Supra*, pp. 58-60) Based on the trial evidence, it was a close case.

The newly discovered evidence undermines what little trial evidence there was. Grover told his family and friends, time and again that MacRae was innocent, he did not Molest Grover, and Grover's accusations were entirely lies to get money from the church.

The statement of facts is replete with examples of the newly discovered evidence. (*Supra*, pp. 3-32 (identified by "**")) The evidence reveals Grover's: a) reputation – at least among his community of family and friends – as a schemer and liar; b) admissions of his intention to extract money from the Diocese by making up accusations against MacRae; c) admissions that his accusations were lies; d) Grover's admissions that his testimony was perjury; and e) behavior once he had his money – casting off his "victim" guise to set off on a course of reckless and vile conduct – is entirely irreconcilable with his claims. The new evidence also explains Grover's inconsistencies and impossible accusations. It is hard to be consistent through lies built on lies.

Each piece of new evidence – and certainly all of the new evidence considered together – proves MacRae's innocence. Had it been available at trial, the only possible result would have been an acquittal. No reasonable juror could have voted to convict when faced with Grover's admissions against penal interest reported by the people closest to him.

**B.    Actual Innocence**

While the Supreme Court may not yet have recognized an inherent constitutional right to freedom based on a showing of innocence (*Herrera v. Collins*, 506 U.S. 390 (1993)), case law has come to place great priority on innocence in deciding habeas corpus matters. For example, in *Sawyer v. Whitley*, 505 U.S. 333 (1992), the Supreme Court held that a petitioner faced with a defense of abusive or successive use of a habeas petition may have his petition heard on the merits if a proper showing of innocence is made. Likewise, in *Schlup v. Delo*, 513 U.S. 298 (1995) the Supreme Court held that a showing of innocence overcomes the one-year statute of limitations for filing a habeas petition. *McQuiggin v. Perkins*, _ U.S. _, 133 S.Ct. 1924 (2013) also recognizes actual innocence as a basis for avoiding a "fundamental miscarriage of justice" to overcome procedural hurdles and

defaults. The innocence-based equitable power to decide habeas petitions  is a critical protection against manifest injustices caused by wrongful incarceration – something that by its very nature must violate the inherent due process rights that the Fourth, Fifth, Sixth, Seventh, Eighth, and Fourteenth Amendments are designed to avoid.

The newly discovered evidence – particularly in light of a trial won by defense counsel's ineffective performance – shows MacRae's innocence. Habeas relief should be granted.

CONCLUSION

Koch's unconstitutionally deficient performance guaranteed MacRae's conviction. The state was unable to produce any evidence to support or corroborate Grover's stories. That is because every accusation was a lie. The recent evidence from Grover's family and friends makes that clear. The prejudice caused by Koch's deficient performance undermines confidence in the outcomes of trial. MacRae is entitled to habeas relief.

MacRae is an innocent man. Grover's admissions make that clear. His trial lawyer failed him in so many critical respects that he was deprived of the right to counsel guaranteed by the Constitution.

Absent Koch's ineffective conduct MacRae would not have been convicted. Had the newly discovered evidence been presented at trial, MacRae would have been acquitted. Either one of those things is sufficient to warrant habeas relief. Together, they require it.

64

For all of these reasons, and all of the reasons presented in state court, petitioner, Gordon MacRae, respectfully requests that this Court grant his Petition for Habeas Corpus, and that an evidentiary hearing be conducted to resolve any pertinent facts in dispute.


Respectfully submitted by his attorneys,


/s/ Robert Rosenthal
Robert Rosenthal
Counselor at Law
523 East 14th Street, Suite 8d
New York, New York 10009
(212) 353-3752



/s/ Cathy J. Green,
Cathy J. Green, Bar #995
Green & Utter, P.a.
764 Chestnut Street
Manchester, NH 03104
(603) 669-8446
Attorneys for Petitioner Gordon MacRae

Dated: January 23, 2014