# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Gordon MacRae,
      Petitioner

      v.                                      Docket No.: 1:14-cv-45-JL

Warden, New Hampshire State Prison.
      Respondent

### RESPONDENT'S MOTION TO DISMISS PETITION AS UNTIMELY

The petitioner claims that he is actually innocent of the charges of which he was convicted.  Doc. 1: 4.  As a result, this Court made a preliminary ruling that, under *McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013), the petition was not time-barred.  Doc. 4: 1.[1]

The petitioner raises the following claims as grounds for habeas corpus relief: (1) ineffective assistance of counsel claims, Doc. 1: 38-73; and (2) a claim of actual innocence, Doc. 1:  73-76.

The respondent now asks this Court to dismiss the petition as untimely.

---

[1] "Doc,_:_" refers to this Court's document and page number.  References to the transcripts are to "Tr._:_" providing the volume and page number.  The transcripts were previously filed conventionally with this Court.

I.      **PROCEDURAL HISTORY**

The petitioner was convicted of one count of felonious sexual assault and four counts of aggravated felonious sexual assault.  *State v. MacRae*, 141 N.H. 106, 107, 677 A.2d 698, 700 (1996).   On appeal, he raised the following issues: "the trial court erred in admitting expert testimony allegedly offered by the State to prove that the victim's allegations of sexual assault were true. He also assert[ed] that the Superior Court *(Brennan,* J.) erred in refusing to allow him to cross-examine the victim about past juvenile convictions and in instructing the jury to disregard portions of the victim's testimony." *MacRae*, 141 N.H. at 107, 677 A.2d at 700.  In 1996, the petitioner's conviction was affirmed.  *Id*.

On April 24, 2012, the petitioner filed a petition for a writ of habeas corpus in the Merrimack County Superior Court.  State Pet.[2]  The superior court bifurcated the issues presented in the petition.[3]

On March 15, 2013, the superior court denied the claim of ineffective assistance of counsel.  Exh. A (attached).  On July 9, 2013, the court found that the evidence that the petitioner presented in his petition was not new.  Exh. B (attached).  The petitioner then filed a notice of discretionary appeal.  Exh. G (filed conventionally with this Court).  The New Hampshire Supreme Court (state court) declined the appeal.

On January 29, 2014, the petitioner filed his petition with this Court.  Doc. 1.

---

[2] "State Pet.:_" refers to the petition filed with the superior court in April 2012.  The respondent has filed a copy of the state petition with this Court by conventional means.  .

[3] "Exh. A:_" refers to the superior court's March 2013 ruling.  "Exh. B:_" refers to the superior court's July 2013 ruling.

## II.    EVIDENCE INTRODUCED AT TRIAL

The state court summarized the evidence introduced at trial as follows:

The [petitioner] was convicted of acts that took place during "pastoral counseling" sessions he conducted with the victim while the [petitioner] was serving as a priest at St. Bernard's Parish in Keene. While the acts occurred between June and November 1983, the offenses were not reported until March 1993, when the victim contacted the Keene police department after learning that his brother had reported similar incidents of sexual abuse by the [petitioner].

The victim's trial testimony lasted approximately four days, during which he was extensively cross-examined. The defense repeatedly attacked the victim's credibility, and questioned him about the delay in reporting the assaults and his inability to recall specific details regarding those assaults. The defense also emphasized the victim's apparent failure to actively resist the assaults, his continued close relationship with the [petitioner] after the assaults, and his testimony that during the assaults he felt dissociated from his body.

Following the victim's testimony, the State called Dr. Leonard Fleischer, a Ph.D. in counseling psychology, to testify about characteristic behaviors of sexual abuse victims in order to rebut many of the negative inferences that could be drawn from the victim's cross-examination.

*MacRae,* 141 N.H. at 107-08, 677 A.2d at 700.

## III.    THE SUPERIOR COURT'S DECISIONS

### A.    The March 2013 Decision on the Ineffective Assistance of Counsel Claim

The superior court found that the petitioner had raised four different claims of ineffective assistance of counsel.  Exh. A: 4.  These were: "(1) in the opening statement, counsel 'opened the door' to uncharged acts testimony after arguing successfully for the inadmissibility of the evidence during pretrial motions; (2) counsel gave the state certain documents containing [the petitioner's] annotations and thoughts that ultimately amounted to the defense 'giving away' its trial strategy; (3) counsel failed to object to the admission of expert testimony elicited through a lay witness; and (4) Attorney Koch improperly permitted secondary counsel Davis to conduct an informal pretrial interview of [the victim]."  Exh. A: 4.

3

### 1.      Opening the Door

The superior court found that defense counsel had successfully moved to exclude three uncharged acts: (1) when the victim was delivering a newspaper to the rectory, the petitioner, after pushing the victim and placing his arm under the victim's throat, "grabbed [the victim's] crotch area and was grinding his body up against" the victim; (2) while the petitioner was driving back from to New Hampshire from dropping the victim's brother at the airport, the victim awoke to find that the petitioner "had his hands on [the victim's] pants and was fondling" him; and (3) when they were driving to get some food, the petitioner "fondled [the victim] through [his] pants." Exh. A: 5.

After the court ruled in favor of the defense, defense counsel "in his opening characterized the first charged incident of sexual abuse as occurring 'out of the clear blue.'" Exh. A: 6 (citing Tr. I: 59). The trial court then ruled that the defense had opened the door to admission of these three incidents. *Id.*

For purposes of its ruling, the superior court "assume[d] without deciding" that the statement was not part of a "calculated risk designed to further a trial strategy." Exh. A: 7. The court found, however, that the petitioner had not met his burden of showing prejudice. Exh. A: 7.

The superior court noted that, "[f]rom the outset, the defense strategy was to attack [the victim's] credibility and call into question his motivations for the allegations he made against [the petitioner]." Exh. A: 7-8. The court noted that this was "the only strategy available to the defense" because the defense could not put on an alibi defense "given the wide time frame during which the assaults were alleged to occur." Exh. A: 8. It also could not call the petitioner because the court had ruled that excluded evidence regarding other victims, and the petitioner's

probation violations, "would be admissible" because these would be probative of the petitioner's credibility.  Exh. A: 8.[4]

The court found that the alleged deficiency could not have resulted in prejudice because "it was inevitable that [defense counsel] would open the door to the uncharged acts" when he attacked the victim's credibility.  Exh. A: 9.  The court also observed that before admitting testimony regarding the uncharged acts, the trial court "instructed the jury that the only permissible use of the evidence, if credible, was to find that [the petitioner] had the opportunity to commit the uncharged acts."  Exh. A: 10.  The trial court further instructed the jury that it could not use the uncharged acts as proof of the charged acts.  Exh. A: 10 (citing Tr. II: 28-29).  The court found that the petitioner had not met his burden of demonstrating that the outcome of the trial would have been different if the door to the uncharged acts had not been opened.  Exh. A: 10.

### 2.    Annotated Discovery

The court next addressed the argument that providing the State with the petitioner's annotated documents constituted ineffective assistance of counsel.  Exh. A: 10.  The state court found that co-counsel "gave several explanations as to why providing the state with copies" was "part of the defense strategy."  Exh. A: 11.  The court also noted that there were two versions of the same documents and that, according to defense counsel Davis, the ones provided to the State, did "not contain any damaging information."  Exh. A: 11 (internal quotation marks omitted) (quoting Davis Affidavit: 135).  Further, defense counsel was able to use the documents to persuade the court to exclude "damaging letters" sent by the petitioner to the detective, who was posing as the victim's brother.  Exh. A: 11.  "Moreover," the court observed, defense counsel

---

[4] The trial attorneys were well aware that the victim's allegations were not the only ones that had been made or, indeed, charged.  In a letter to Mr. Koch in August 1994, Mr. Davis noted charges that had been brought Cheshire and Rockingham Counties.  Doc. 1-28: 6.

"elicited from [the investigating detective], that before trial he reviewed [the petitioner's] annotations and was aware of some of the inconsistencies in [the victim's] allegations." Exh. A: 11.  The court found that there was no proof of ineffective assistance of counsel. Exh. A: 11-12.

### 3.      The Detective's Expert Testimony

The court found that the detective testified that adults who were sexually assaulted as children initially "give a rough outline" of the abuse and later "will come up with additional facts about their victimization." Exh. A: 12.  The detective explained that the word "confabulation" meant that the "mind will take incidents of abuse that happened years ago" and recall incidents that happened on the same day as happening on three separate days "or vice versa." Exh. A: 12 (quoting Tr. VII: 97-98).

The court found that counsel was ineffective when he to object to the court's ruling that the detective's testimony was admissible. Exh. A: 14.  However, the court found that the petitioner had not demonstrated prejudice. Exh. A 14.  The court found that defense counsel "effectively cross-examined" the detective on the victim's inconsistent statements and the shortcomings of the detective's investigation. Exh. A: 15.  The court also found that the jury "heard the same type of testimony" from the State's expert. Exh. A: 15.  Further, in its instructions to the jury on expert testimony, the court only mentioned the State's expert and did not mention the detective as an expert. Exh. A: 15.  The superior court concluded that the petitioner had not borne the burden of demonstrating prejudice. Exh. A: 15.

### 4.      Assignment of Interview to Local Counsel

Finally, the court addressed the petitioner's claim that lead counsel was ineffective when he allowed local counsel Davis to handle an "informal, pretrial interview" of the victim. Exh. A: 15.  The court further observed that the petitioner claimed that trial counsel was ineffective when

6

he failed to depose the victim.  Exh. A: 16.  The court finally observed that the petitioner claimed

that local counsel was not prepared for the interview.  Exh. A: 16.

The court first observed that the trial court had "specifically limited" the defense to an

"informal interview and not a deposition."  Exh. A: 16 (citing Motion Hearing Tr.: 36-39).  The

court observed that a deposition, if permitted, could have been used by the State to lock the

victim into his trial testimony.  Exh. A: 16.  Further, trial counsel had written to local counsel,

telling him that he did not want to meet with the victim himself so that he would not be a

"familiar figure" at trial.  Exh. A: 16.  Although Davis felt inadequately prepared, he made an

extensive review of the discovery and neither trial counsel nor the petitioner shared Davis's

concerns.  Exh. A: 16.  The court found that this was "sound trial strategy."  Exh. A: 17.  The

court then dismissed the petition for a writ of habeas corpus.

### B.  The July 2013 Decision on the Motion for a New Trial Based on Newly Discovered Evidence

The superior court first examined the three areas on which the petitioner contended that a

new trial was merited.  Exh. B: 2.  These were:

> (1) testimony that [the victim] bragged about his intention to obtain money from
> the church and admitted that his testimony at trial was perjured (see statements of
> [the victim's] ex-wife, Trina Ghedoni, his former stepson, Charles Glenn, a
> former counselor, Debra Collett, and Steven Wollschlager, a peer from Keene,
> New Hampshire);  (2) evidence regarding [the victim's] reputation and character
> (see statements of Trina Ghedoni and [the victim's former stepdaughters, Ms.
> Collett and Mr. Wollschlager); and (3) photographic evidence reflecting [the
> victim's] actions with regard to the money he received after he obtained judgment
> against the diocese.

Exh. B: 2.

The court then noted that, to succeed on a motion for a new trial, the petitioner would

have to show: (1) that he was not at fault for failing to discover the evidence; (2) that the

evidence was "admissible, material to the merits and not cumulative"; and (3) that the evidence

was "of such a character that a different result [would] probably be reached upon another trial." Exh. B: 3 (citations and internal quotation marks omitted).

Addressing the first claim, the court noted that Trina Ghedoni and Charles Glenn were both convicted felons.  Exh. B: 3.  According to the court, the two of them gave statements that the victim wanted to "get even" with the church and, therefore, made false allegations against the petitioner.  Exh. B: 3.  Ghedoni's statement concerned a chess set that the victim said that he had seen in the rectory, but was not purchased until three years later.  Exh. B: 4.  Glenn told the petitioner's investigator that the victim told him on several occasions that the petitioner had never molested him.  Exh. B: 4.  The court noted that the statements by Wollschlager was that "all the kids in Keene" knew that the victim and his brother were setting up the church and its priests.  Exh. B: 4 (internal quotation marks omitted).

At the outset, the court noted in a footnote that the respondent had filed a supplement to its answer and motion to dismiss.  Exh. B: 4 n.1.  The supplement was a letter sent by Glenn claiming that "the petitioner's investigator asked [him] to lie in his statements and, in return, the investigator would provide financial assistance to Glenn's mother [Ghedoni]."  *Id.*  The court concluded that the letter "raise[d] serious concerns about the veracity and credibility of any of Charles Glenn's statements in this case."  *Id.*

The superior court concluded that the evidence was not new.  Exh. B: 4.  Each of the people listed were present during the investigation and either testified or could have been called at trial.  *Id.*  Ghedoni was "dating and later married" the victim.  *Id.*  Charles Glenn, the court observed, is Ghedoni's son.  *Id.*  The court concluded that "[b]ecause the petitioner had access to these individuals and counsel could have interviewed them, he cannot meet his burden that he

was not, at least, somewhat at fault for the failure to discover this evidence at the time of trial."
Exh. B: 5.

The court further found that "the allegations that [the victim] lied about seeing the chess
set in the rectory during the abuse [did] not meet the new evidence standard because they [were]
cumulative." Exh. B: 5. The court noted that, under state law, cumulative evidence "is defined
as additional evidence of the same kind to the same point." *Id.* (citation and internal quotation
marks omitted). The court pointed out that John Karonis had testified at trial that he saw the
petitioner after he returned from vacation in Maine in 1986 or 1987. *Id.* Karonis testified that
the petitioner had brought the chess set home as a souvenir. *Id.* Father Rochefort "confirmed
that he remembered [the petitioner] purchasing the chess set that stayed in the rectory during
their 1986 vacation in Maine." *Id.* (citing to Tr. VII: 71). The court noted that, "[t]his
testimony, provided at trial, conflicted with [the victim's] testimony that there was a chess set in
the rectory when [the petitioner] abused him in 1983." *Id.* Because the statements of Ghedoni
and Collett regarding the same chess set [were] cumulative, they could not constitute a basis for
a new trial. *Id.*

The court then turned to the evidence of the victim's reputation. Exh. B: 5. Ghedoni,
and the victim's former stepdaughters (Tineesha Glenn and Shalina Glenn) each gave statements
to the investigator concerning the victim's character. Ghedoni told the investigator that the
victim was "a compulsive liar," "a manipulator," and "a drama queen." Exh. B: 5 (internal
quotation marks omitted). The stepdaughters characterized the victim as "a creep," "a pervert,"
and a "sick individual who was obsessed with sex and teenage girls." Exh. B: 5-6 (internal
quotation marks omitted).

The court found that this reputation evidence did not support the petitioner's motion for a new trial. Exh. B: 6. The court noted that the statements provided by the stepdaughter was inadmissible under New Hampshire Rule of Evidence 608. Exh. B: 6. It then observed that, because the evidence only addressed the victim's credibility, it could not constitute a basis for a new trial. Exh. B: 6. The court not that this was "especially true in this instance, given that hammering on the credibility of [the victim] was the [petitioner's] primary (if not only) trial strategy." Exh. B: 6. The court concluded that "evidence pertaining to [the victim's] reputation, credibility, or the like" was cumulative and "not of the character" that warranted a new trial. Exh. B: 6.

The court also rejected the claim that Ghedoni's photographs from 1996 "depicting members of Trina Ghedoni's family posing with large sums of cash" constituted a basis for a new trial. Exh. B: 7. The court noted that Ghedoni had cut the victim out of the photographs. Exh. B: 7. Ghedoni told the investigator that the money was from the settlement between the church and the victim. *Id*. The court found, however, that even if the defense could prove that the victim participated in the photographs, "the evidence would be likely inadmissible" under New Hampshire Rule of Evidence 402. Exh. B: 7. It could not, therefore, be a basis for a new trial. Exh. B: 7.

The court then turned to the statements of Steven Wollschlager, Debra Collette, and the petitioner's friends, Leo and Penny Demers. Exh. B: 7. Wollschlager, who had been interviewed as another possible victim, said that the detective in the case had "paid him to lie" and that the petitioner had never made any sexual advances toward him. Exh. B: 8. Collett, the court found, told the petitioner's investigator that the police officers assigned to the case had made up their minds about the petitioner's guilt and did not listen to her. Exh. B: 8. Collett also

offered the opinion that her testimony at trial was "confusing and misunderstood," because she meant to testify that the victim had "alluded to the fact that he was molested by his stepfather and a clergyman and not that he disclosed the abuse to her."  Exh. B: 8.  The Demers gave their opinions that the petitioner was innocent and offered observations of the victim's behavior at trial.  Exh. B: 8.

The court concluded that none of this evidence was new because all of these witnesses were available at the time of trial.  The court noted that Wollschlager had been subpoenaed by the State, who had provided the defense with his statements.  Exh. B: 8.  The court further found that Wollschlager's denial that the petitioner had never molested him was "likely inadmissible as irrelevant"  under New Hampshire Rule of Evidence 402.  Exh. B: 9.  The statement would not have proven that the petitioner did not molest the victim and "likely would have opened the door to testimony regarding other alleged victims, which the [trial] court had ruled inadmissible."  Exh. B: 9.

Collett, the trial court noted, had testified at trial.  Exh. B; 9.  In fact, she testified that the victim had difficulty in his therapy sessions with her because of his "lack of honesty" and that he had only told her that one of his abusers was a clergyman.  Exh. B: 9 (internal quotation marks omitted) (citing Collette Tr. 7, 10).  The court found these statements cumulative and, therefore, not a basis for a new trial.

Finally, the court found that the court was made aware of the Demers' observations and addressed them.  Exh. B; 9-10.  The court concluded that the petitioner could not show that their statements constituted new evidence and, consequently, denied the motion for a new trial

## IV.  THE PETITION IS UNTIMELY.

### A.  The Petition Was Filed Outside The Statute Of Limitations In 28 U.S.C. § 2254.

The petition was filed well outside the one-year limitations period set forth in 28 U.S.C. § 2244(d).  That statute provides as follows:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of—
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> >
> > (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> >
> > (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).  It is undisputed that the petitioner has not met the one-year statute of limitations in this case.  This Court should dismiss the petition as untimely.

**B.** **Even If The Statements Are Considered "Newly Discovered Evidence," The Petition Is Still Untimely.**

The petitioner claims that newly discovered evidence should reset the statute of limitations and that, because the petition was "filed within one year of the collection of sufficient newly discovered evidence to support [his] petition – less the time period that his state court post-conviction petition, which was properly filed, was pending in court." Doc. 1: 5. He concludes that the petition was filed within the time limits of 28 U.S.C. § 2254 motions. *Id.*[5] This argument misconstrues the statute.

As noted above, if the petition alleges newly discovered evidence, the filing deadline is one year from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D).

The last of the interviews in this case took place on August 27, 2009. *See* Doc. 1: 3. Assuming, without conceding, that this interview constituted newly discovered evidence and the statute began running on that date, the petitioner had 455 days in which to file his petition with this Court or to file a petition that would effectively toll the statute in the superior court. As a result, the petitioner had until November 25, 2010 to either file a petition with this Court or to toll the statute by filing something in state court.

The petitioner filed his petition in Merrimack County Superior Court on April 24, 2012, some 516 days after the petition was due (again assuming, for the sake of argument, that the evidence is new) with this Court. From November 2010 until his pleading was filed in the

---

[5] The petitioner also contends that his "newly discovered evidence claim establishes actual innocence, which overcomes any time or procedural bars that might be alleged." Doc. 1: 5-6; see also Doc. 1-1: 46-47. This claim is discussed later in this motion.

superior court, nothing tolled the statute of limitations in federal court.  By the time his petition was filed in this Court, the statute of limitations had long since expired.

### C.     The Actual Innocence Exception Does Not Relieve The Petitioner Of The Constraints of the Statute of Limitations.

The petitioner relies on his claim of actual innocence to warrant this Court's relief and elude the statute of limitations.  Doc. 1-1: 73-74.  As a result, the respondent will address the merits of the petitioner's claims in order to support its motion to dismiss.  This is because, as discussed below, the petitioner cannot bring a free-standing claim of actual innocence, but must connect it to a violation of his federal constitutional rights.  Although some of the discussion presented here might well be appropriate content in a motion for summary judgment, in order to argue the timeliness bar, the respondent cannot avoid addressing the merits.  In doing so, the respondent has not addressed every claim raised in the petitioner's 61-page memorandum of law and may seek to file a motion for summary judgment or a supplemental motion should this motion be denied.

### 1.     The United States Supreme Court Rule

In several opinions, the United States Supreme Court has addressed both actual innocence and the exception to the 28 U.S.C. § 2244(d)(1)(D) deadline.  "Once a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears."  *Herrera v. Collins*, 506 U.S. 390 (1993) (citing *Ross* v. *Moffitt*, 417 U.S. 600, 610 (1974) ("The purpose of the trial stage from the State's point of view is to convert a criminal defendant from a person presumed innocent to one found guilty beyond a reasonable doubt")).

"[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass" when the statute of limitations has expired.  *McQuiggen v. Perkins,* 133 S.Ct. 1924, 1928 (2013).

"[T]enable actual-innocence gateway pleas are rare." *Id.* "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 329 (1995). *See also House v. Bell*, 547 U.S. 518, 538 (2006) (emphasizing that the *Schlup* standard is "demanding" and seldom met). "The gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" *McQuiggin*, 133 S.Ct. at 1936 (quoting *Schlup*, 513 U.S. at 316). As *McQuiggin*, noted, "the timing of the [petition]' is a factor bearing on the 'reliability of th[e] evidence' purporting to show actual innocence." *McQuiggin*, 133 S.Ct. at 1928 (quoting *Schlup*, 513 U.S. at 332).

### 2.    Review Of Actual Innocence Claims In Habeas Corpus Cases

"Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera*, 506 U.S. at 400. "Where newly discovered evidence is alleged in a habeas application, evidence which could not reasonably have been presented to the state trier of facts, the federal court must grant an evidentiary hearing. Of course, such evidence must bear upon the constitutionality of the applicant's detention; *the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus*." *Townsend v. Sain*, 372 U.S. 293, 317 (1963) (emphasis added).

"[F]ederal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution--not to correct errors of fact." *Herrera*, 506 U.S. at 400-01 (citing *Moore* v.

*Dempsey*, 261 U.S. 86, 87-88 (1923) (*Holmes*, J.) ("What we have to deal with [on habeas review] is not the petitioners' innocence or guilt but solely the question whether their constitutional rights have been preserved"); *Hyde* v. *Shine*, 199 U.S. 62, 84 (1905) ("It is well settled that upon *habeas corpus* the court will not weigh the evidence"); *Ex parte Terry*, 128 U.S. 289, 305 (1888) ("As the writ of *habeas corpus* does not perform the office of a writ of error or an appeal, [the facts establishing guilt] cannot be re-examined  or reviewed in this collateral proceeding.")).  "Federal courts are not forums in which to relitigate state trials." *Barefoot* v. *Estelle*, 463 U.S. 880, 887 (1983).  "Few rulings would be more disruptive of our federal system than to provide for federal habeas review of freestanding claims of actual innocence." *Herrera*, 506 at 401.

Moreover, "there is no guarantee that the [reviewing court's] guilt or innocence determination would be any more exact." *Herrera*, 506 U.S. at 403.  "To the contrary, the passage of time only diminishes the reliability of criminal adjudications." *Id.* (citation omitted). *See also McCleskey* v. *Zant*, 499 U.S. 467, 491 (1991) ("When a habeas petitioner succeeds in obtaining a new trial, the 'erosion of memory and dispersion of witnesses that occur with the passage of time' prejudice the government and diminish the chances of a reliable criminal adjudication") (internal quotation marks and citation omitted).

### 3.     The Petitioner's Claims Do Not Satisfy The Definitions of Actual Innocence Or Newly Discovered Evidence.

The petitioner notes that he offered the superior court evidence, through the statements of the petitioner's friends, and those who dislike the victim, that the victim told them that his accusations were "nothing but lies." Doc. 1-1: 48.  He contends that, if defense counsel had investigated this evidence, the "[n]o reasonable jury would have convicted [the] Petitioner." *Id.* The petitioner further argues that the superior court, having identified the claim, "chose to ignore

16

it." *Id.* He contends that the superior court failed to consider its merits "individually and collectively with the other instances of ineffective assistance, as is required by *Strickland* and its progeny." *Id.*[6]

The petitioner has not directed this Court to any controlling United States Supreme Court precedent based on indistinguishable facts in order to call the superior court's decision into question. Instead, he asks this Court to reweigh the evidence in his trial more than two decades ago. His petition is almost entirely based on attacking the credibility of the victim; credibility determinations made by the jury two decades ago. His newly discovered evidence provides nothing more than additional avenues of attack on cross-examination through witnesses of whom he was well aware at the time of trial. As the superior court noted, the victim's credibility was repeatedly attacked during the trial, Exh. A: 8-10, and yet the jury still believed him.

While it was the petitioner's absolute right not to testify at his trial, the superior court's observations about the kinds of attacks that might have been made on him are worth considering in light of his claims of actual innocence. The court noted that the defense could not call the petitioner because the court had ruled that excluded evidence regarding other victims, and the petitioner's probation violations, "would be admissible" because these would be probative of the petitioner's credibility. Exh. A: 8.

The claim of actual innocence, in light of the other charges that were pending against him, is suspect at best. While the petitioner spends much time putting his convictions in the context of the times, *see* Doc. 1-1: 13-16, he does not mention that the "moral panic," Doc. 1-1: 16, that he decries as leading to his false conviction also included other accusations made against him in different parts of the State of New Hampshire. He claims that his prosecution can be seen

---

[6] The petitioner also asserts a due process right to habeas relief on the ground that he is actually innocent. Doc. 1-1: 49. He correctly acknowledges, however, that this right "has not yet been recognized by the United States Supreme Court." *Id.* As such, this Court should not consider the argument.

in the context of the public outrage at the numerous accounts of abuse by the clergy.  What he does not tell this Court, however, is that he was prevented from taking the witness stand because of the other allegations against him and his probation violations.

Because timing is relevant to the filing of a habeas corpus conviction, *McQuiggin*, 133 S.Ct. at 1926, the fact that he waited for nearly twenty years before filing with this Court is noteworthy and should be counted against him.  As the *McCleskey* court noted, time leads to the "erosion of memory and dispersion of witnesses."  *McCleskey*, 499 U.S. at 491.  Lead defense counsel, Ron Koch, Esq., died in December 2000, so the concerns about delay have already been realized, at least with respect to one witness, in this case.

Several of the claims raised here simply could never constitute a basis for tolling the statute because they were clearly known at the time.  For example, it is not "newly discovered evidence" that defense counsel opened the door during his opening, that the detective testified as he did, that local counsel (with the petitioner's acquiescence) interviewed the victim, or that defense counsel (with the petitioner's acquiescence) provided the State with a sanitized version of the petitioner's notes.  The petitioner could have raised these claims with this Court in a timely manner.  He is attempting to use his dubious claims of newly discovered evidence to bootstrap consideration of claims that are clearly time barred.  This he should not be allowed to do.

And, as discussed below, the newly discovered evidence is neither new nor reliable. The petitioner's claims of actual innocence rely on persuading this Court to discredit the testimony given at trial and crediting the dubious statements of people made nearly two decades later.  This Court should decline his invitation to do either.

### 2.      The Ineffective Assistance of Counsel Claim

### a.      Standard of Review

Because this Court cannot consider a free-standing actual innocence claim, this Court must review the superior court's ruling on the ineffective assistance of counsel claim.  Because the superior court addressed the merits of the claim and applied the appropriate test, this Court's review is deferential.  *See Knight v. Spencer*, 447 F.3d 6, 11 (1st Cir. 2006) ("The Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA') prevents a federal court from granting an application for a writ of habeas corpus with respect to a claim adjudicated on the merits in state court unless that adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States") (internal citation and quotation marks omitted)); *see also Teti v. Bender*, 507 F.3d 50, 56 (1st Cir. 2007) (The petitioner must show that the state court's decision "'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'") (quoting 28 U.S.C. § 2254(d)(2) (2006)).

A state court decision is "contrary to" established Supreme Court authority if it results from applying a rule that contradicts governing law or is inconsistent with a Supreme Court decision in a case with essentially indistinguishable facts.  *See Aspen v. Bissonnette*, 480 F.3d 571, 574 (1st Cir. 2007).   A state court ruling is an "unreasonable application" of controlling Supreme Court authority if the state court states the correct legal principle but applies the principle unreasonably to the petitioner's case.  *Id.*  In addition, findings by the state court are conclusive unless overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1) (2000).

Strickland provides court with a general rule.  "Where, as here, the federal law in question sets forth general principles, state courts have considerable flexibility to exercise their judgment in reaching outcomes."  *Abram v. Gerry*, 672 F.3d 45, 51 (1st Cir. 2012) (discussing a Confrontation Clause claim); *see also Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004) ("The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

### b.  The *Strickland* Test

"The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003).  To establish an ineffective assistance of counsel claim, the petitioner must demonstrate two things: (1) that "counsel's representation fell below an objective standard of reasonableness" and  (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

Under the first requirement, there is a "strong presumption" that counsel's tactics fell "within the wide range of reasonable professional assistance."  *Id.* at 689.  Only if counsel's choice of action was so unreasonable that no competent attorney would have made it is the first prong satisfied.   *Knight*, 447 F.3d at 15; *see also Sleeper v. Spencer*, 510 F.3d 32, 38 (2007) (this deferential standard seeks to eliminate the distortion of hindsight.).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  "This is a highly demanding and heavy burden."  *Knight*, 447 F.3d at 15 (internal citation and quotation marks omitted).

### c.     The Cumulative Error Doctrine Is Not Clearly Established
Federal Law

The petitioner contends that, "[c]umulative review is critical and required by settled

Supreme Court law." Doc. 1-1: 47. He contends that the superior court's failure to apply the

doctrine was, therefore, error. *Id.*[7]

Under the cumulative error doctrine, "individual errors, insufficient in themselves to

necessitate a new trial, may in the aggregate have a more debilitating effect." *United States v.*

*Sepulveda*, 15 F.3d 1161, 1195-96 (1st Cir. 1993). "Cumulative error analysis is inappropriate

when the defendant complains of the cumulative effect of non-errors." *United States v. Thrower*,

746 F. Supp. 303, 307 (D. Mass. 2010) (citing *United States v. Stokes*, 124 F.3d 39, 43 (1st Cir.

1997)). *See also* R.A. Moyer, "To Err is Human; To Cumulate, Judicious: The Need for U.S.

Supreme Court Guidance on whether Federal Habeas Courts Reviewing State Convictions May

Cumulatively Assess Strickland Errors," 61 Drake L. Rev. 447, 450 (Winter 2013) ("Cumulative

error occurs when the aggregate effect of 'two or more individually harmless errors' prejudices a

party 'to the same extent as a single reversible error.' As one court has explained, 'a column of

---

[7] The petitioner argues that the court must consider ineffective assistance of counsel claims "collectively, not item-by-item." Doc. 1-1: 51 (internal quotation marks omitted). He credits this quotation to *Strickland* and to *Kyles v. Whitley*, 514 U.S. 419, 436 (1995). The phrase does not appear in *Strickland*, but it does appear in *Whitley*, referring, as the petitioner notes, to claims that the prosecution withheld exculpatory evidence. *See, e.g.. Whitley*, 514 U.S. at 436 ("The fourth and final aspect of *Bagley* materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item by item. As Justice Blackmun emphasized in the portion of his opinion written for the Court, the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense.")   The respondent did a LEXIS search using the phrase and found 313 state and federal cases in which the phrase is used. In none of those cases was the phrase from *Whitley* used to assess a claim of ineffective assistance of counsel. Rather, the *Whitley* and *Strickland* references refer to the petitioner's burden of proof (i.e., the "reasonable probability" standard), not the reviewing court's analysis of the claims. *See, e.g., Young v. United States*, 2009 U.S. Dist. LEXIS 56430  (M.D. Tenn. July 2, 2009) ("Reasonable probability has the same meaning in this context as it did in the ineffective assistance of counsel context. To determine whether there was prejudice, the court must consider the effect of the suppressed evidence collectively, not 'item by item.'") (Citations omitted.).

errors may sometimes have a logarithmic effect, producing a total impact greater than the arithmetic sum of its constituent parts.'") (Citations omitted)).

At the outset, although the petitioner contends that the United States Supreme Court has adopted the cumulative error doctrine, Doc. 1-1: 47, this is simply not the case.  The cumulative error doctrine has not been adopted by the Supreme Court.  *See Johnson v. United States*, 860 F. Supp. 2d 663, 749 (N.D. Iowa 2012) (Noting that "the Supreme Court has *never* expressly accepted or rejected cumulative review." (Emphasis in original)).  Indeed, the United States Circuit Courts of Appeals vary widely in the doctrine's adoption and application.  *See id*. at 750 n.24 (discussing the "bewildering" differences between the Circuit Courts of Appeals in applying the doctrine); *see also* Moyer, 61 Drake L. Rev. at 451 (noting that the United States Supreme Court has not ruled on the doctrine).

The petitioner's reliance on *Williams v. Taylor*, 529 U.S. 362, 394 (2000) is misplaced. There, the United States Supreme Court addressed the burden of proof, not the cumulative error doctrine.  In reversing the appellate court and approving the trial court's standard, the *Williams* court did not address the cumulative error doctrine.

As a result, although the United States Court of Appeals for the First Circuit recognizes the doctrine, the superior court's alleged failure to apply it cannot constitute a basis for relief here.  This is because the doctrine is not clearly established Federal law, as determined by the Supreme Court of the United States."  *Knight*, 447 F.3d at 11.  And although the United States Court of Appeals for the First Circuit has recognized the doctrine, it also acknowledges that non-errors are not part of the equation.  *Thrower*, 746 F. Supp. at 307.

But even if the cumulative error doctrine applied, the petitioner could not meet his burden of showing that he was entitled to relief from this Court.  The superior court found ineffective

assistance with respect to one claim:  the failure to object to the detective's expert testimony.

Exh. A:  12.  The superior court also assumed, without deciding, that the "out of the blue"

reference in defense counsel's opening statement was also ineffective assistance of counsel.

Exh. A: 7.  As a result, the petitioner has one error and one possible error as a grounds for this

claim.  Setting aside for the moment his lack of citation to controlling United States Supreme

Court precedent, the superior court's ruling was not constitutionally unsound.

First, with respect to the recognized error, the superior court correctly noted that the

substance of the detective's expert testimony also came in through another prosecution witness.

Exh. A: 14.  The petitioner, however, contends that the detective's testimony was "far more

compelling" than that of the actual expert.  Doc. 1-1: 60 n.21.  He argues that the detective's

testimony also contained "the approval of the experienced officer who elicited" the victim's

claims.  *Id*.  This assertion is pure speculation.  By inviting this Court to join in this speculation,

the petitioner is asking it to reweigh the evidence, a role that the United States Supreme Court

has said it is not within this Court's power to assume.  *Hyde*, 199 U.S. at 84.

There is nothing on the record that suggests that the jurors found the detective's opinion

particularly persuasive on this point, nor is there anything on the record to suggest that the jury

even remembered his testimony.  There is, however, proof that the jury was appropriately

instructed on the appropriate use of expert testimony and there is nothing to suggest that they did

not follow that instruction. *See United States v. Lee*, 317 F.3d 26, 35 (1st Cir. 2003) (Jurors are

presumed to follow instructions.).

Second, the court correctly observed that the uncharged acts would become admissible

under the New Hampshire Rules of Evidence because the defense strategy was to attack the

credibility of the victim.  Exh. A: 7-8.  With respect to this ruling, two points bear consideration.

The first is that, as an evidentiary ruling, the superior court's order relies on state law.  It is, therefore, unreviewable.  *Perruquet v. Briley*, 390 F.3d 505, 511-12 (7th Cir. 2004) ("Because a state trial court's evidentiary rulings and jury instructions turn on state law, these are matters that are usually beyond the scope of federal habeas review.").

The second point is that the defense did attack the credibility of the victim, repeatedly and forcefully.  *MacRae,* 141 N.H. at 107-08, 677 A.2d at 700.  The cross-examination began on the third day of trial.  Tr. III: 44.  It continued the following day.  Tr. IV: 9.  And it continued well into the fifth day.  Tr.: V: 3-121.  Virtually the very first question defense counsel asked suggested that the victim was lying.  Tr.: 3: 45-46.  And defense counsel attacked the victim's credibility with respect to each of these uncharged events, challenging not only his account on the stand, but his statements to the police.  *See, e.g.,* Tr. III: 13-17.  The challenge to his account always included suggestions to the jury that the victim was lying.  *See e.g.* Tr. IV: 17 (confronting the victim with his "habitual pattern of lying").

In sum, the cumulative error doctrine is not clearly established Supreme Court precedent and, even if it were, the petitioner could not satisfy its standard.  The petitioner has not met his burden of demonstrating entitlement to habeas corpus relief.

**c.     The Ineffective Assistance of Counsel Ruling Was Not Contrary To Clearly Established Federal Law.**

As noted above, the superior court ruled that two of the petitioner's claims did not constitute ineffective assistance of counsel, it assumed without deciding that one claim may have been ineffective assistance of counsel, and a final claim was ineffective assistance of counsel. The superior court also found that the petitioner had not established prejudice.  Exh. A: 10, 15.

### i.       Opening the Door

The petitioner makes several arguments in support of his claim that the superior court's ruling was constitutionally unsound.  He argues first, that, in opening the door to uncharged acts, counsel's act was "self-destructive" and "[w]itless behavior."  Doc. 1-1: 57.  He claims that the "sheer weight of the uncharged acts crushed the defense."  Doc. 1-1: 59.  In support of his contention, he directs this Court to several circuit court cases.  Doc. 1-1: 57-58.  He does not, however, cite a controlling United States Supreme Court case and, as a result, his claim fails.

The petitioner claims that the "defense to [the petitioner's] charged acts claims was unrelated to the uncharged allegations."  Doc. 1-1: 61.  The superior court found, however, that a strategy based on attacking the complainant's credibility would result in the admission of the other acts.  The court wrote that, in presenting the defense, "a dominant theme recurred—[the victim] was introduced to [the petitioner] for legal and mental help.  [The victim] would not have submitted to sexual abuse in such a distraught state, and he would not have continuously returned for further abuse."  Exh. A: 9.  The court concluded that this strategy would have resulted in the admission of the uncharged acts.  *Id*.

The petitioner does not challenge the superior court's view of his defense.  To the contrary, he concurs in its characterization, stating that the defense was:  "[The victim] the liar, addict, and criminal, whose accusations changed opportunistically, and objective circumstances including non-existent chess sets, doors with windows in them that do not lock, and people within hearing distance."  Doc. 1-1: 62.  He does not explain how assaults on the credibility of the victim would not have resulted in the admission of additional corroborating evidence.  In short, he has not explained why the superior court's ruling on this evidentiary issue is wrong.  In

addition, because the court's decision turns on an evidentiary ruling, it is not reviewable.

*Perruquet v. Briley*, 390 F.3d 505, 511-12 (7th Cir. 2004) ("Because a state trial court's

evidentiary rulings and jury instructions turn on state law, these are matters that are usually

beyond the scope of federal habeas review.").

Second, as the superior court noted, defense counsel cross-examined the victim about

inconsistencies in his accounts of the uncharged acts.  Exh. A: 9.  While the petitioner claims that

the alleged mistake "[n]early doubled the accusations," it also increased the avenues of

challenging the victim's credibility.  The victim was on the stand for cross-examination for more

than two days and the defense investigated these additional lines of inquiry.  If the jury believed

that the charged assaults were fabrications, it certainly would not have convicted the petitioner

for lesser, uncharged, events.  Despite his objection to the superior court's ruling, the petitioner

has not shown that he suffered prejudice.

Finally, the petitioner has not explained why the superior court was wrong to rely on the

limiting instruction. Since juries are presumed to follow instructions, this Court should assume

that the petitioner's jury did just that and that the evidence was not used improperly.  As a result,

the petitioner cannot demonstrate prejudice.

His reliance on the circuit cases is unpersuasive.  For example, in *Fisher v. Gibson*, 282

F.3d 1283 (10th Cir. 2002), the court criticized defense counsel for his lack of preparation, inept

cross-examinations, and for a "fundamental violation of his duty of loyalty by exhibiting actual

doubt and hostility toward his client's case."  *Fisher*, 282 F.3d at 1300.

In *United States v. Villapardo*, 259 F.3d 934 (8th Cir. 2001), the district court did not

abuse its discretion when it concluded that counsel was ineffective when he "improperly elicited

testimony from [a witness] that [the defendant] made threats to her and told her he had ordered

the murder of someone who had raped his child in California." *Villapardo*, 259 F.3d at 937.  In Berryman v. Morton, 100 F.3d 1089, 1096 (3d Cir. 1996), the court observed that trial counsel's defense was "not guided by any strategy or theory."   It continued, "Although an attorney can certainly make alternative arguments to a jury, [counsel's] arguments were not in the alternative, they were unguided, and inept shots at anything that moved, or that appeared to move, with no apparent purpose, thought, or strategy."  *Id*.

The petitioner compares the errors in this case with those egregious errors, but a review of the trial transcript shows that Koch was well-prepared and put the State to its test through effective cross-examination.  In the end, this case turned on the credibility of the victim.  The defense assailed that credibility, but did not persuade the jury.

### ii.    Annotated Discovery

As noted above, the superior court found that the act of giving the State the annotated discovery did not constitute ineffective assistance of counsel.  The court found that co-counsel said that the documents "did not contain any damaging information" and it had been used to secure a favorable ruling from the superior court.  Exh. A: 11 (internal quotation marks omitted).

The petitioner impliedly criticizes the superior court for considering "recent statements from J.R. Davis," who served as local counsel and offered explanations as to why the document was provided to the State.  Doc. 1-1: 67.

Two facts bear mentioning here.  The first is that lead defense counsel, Ron Koch, Esq., died at age 49 on December 19, 2000.  *See* Obituary, *Albuquerque Journal*, Dec. 21, 2000.  As a result, Davis is the only member of the petitioner's legal team who is available to answer questions.

The second is that, according to the letter enclosing the discovery sent by Mr. Koch to the county attorney, the petitioner concurred in this decision.  Mr. Koch wrote that he was enclosing:

> A summary of [the petitioner's] response to [the victims'] allegations.  As a technical matter, this is work-product and not discoverable, however, since we are after a search for the truth in this situation, I have decided to send you the information because I have the impression that you and Mr. Gainor are truly committed to understanding both sides of the allegations, i.e. you want to know the truth.  In one sense, these documents expose our defense and remove the element of surprise, however, I spoke about releasing these documents to you and Mr. MacRae indicated that he had no objection to your viewing the materials because he believes the more information you receive, the more likely you will see that the allegations are false.

Doc. 1-18: 1.  The petitioner filed an affidavit with the superior court in 2011, Exh. 1-13: 1, but he elected *not* to explain to the superior court why he supported trial counsel's decision in February 1994, but found it ineffective assistance of counsel nearly sixteen years later.

As a legal matter, this acquiescence undercuts the petitioner's claim that counsel was ineffective.  *See United States v. Weaver*, 882 F.2d 1128, 1140 (7th Cir.1989) ("Where a defendant, fully informed of the reasonable options before him, agrees to follow a particular strategy at trial, that strategy cannot later form the basis of a claim of ineffective assistance of counsel [under *Strickland*]."); *see also Lave v. Dretke*, 416 F.3d 372, 380 (5th Cir. 2005) (same); *United States v. Williams*, 631 F.2d 198, 204 (3d Cir.1980) (no ineffective assistance existed because the defendant agreed with  trial counsel's tactical decision); see also *Hammond v. Hall,* 586 F.3d 1289, 1327 -1328 (11th Cir. 2009); *see also State v. Brown*, 160 N.H. 408, 416, 999 A.2d 295, 302 (2010).  "To allow that would be to exempt defendants from the consequences of their actions at trial and would debase the right to effective assistance of counsel enshrined in the sixth amendment."  *Weaver*, 882 F.2d at 1140.

### iv.      Interviewing the Victim

Finally, the petitioner claims that counsel was ineffective when he did not personally interview the victim.  Doc. 1-1: 71 (entitled "Counsel's Failure to Conduct Important Discovery Undermined the Defense").  He argues, "What was lost was incalculable.  Nothing was gained.  There was nearly no discussion of accusations.  Unprepared.  Davis could not ask for details."  Doc. 1-1: 72.

The petitioner dismisses the superior court's ruling, but he does not explain how it is inconsistent with clearly established federal law.  Instead, he asserts that the superior court's ruling was "not supported by the record," without pointing to any part of the record that draws it into question.

Although co-counsel expressed concerns about interviewing the victim, he also said that lead counsel and the petitioner did not share these concerns.  Again, as noted above, this acquiescence undercuts the petitioner's claim that counsel was ineffective.  *Weaver*, 882 F.2d at 1140; *Williams*, 631 F.2d at 204; *Hammond,* 586 F.3d at 1327 -28.  The petitioner has not demonstrated that he is entitled to a waiver of the statute of limitations and habeas corpus relief on this ground.

### 4.      The Trial Court's Ruling On The "Newly Discovered Evidence" Was Not Inconsistent with Clearly Established Federal Law.

Finally, the petitioner relies on the claim that newly discovered evidence warrants relief from this Court.  He points out that the state court found that "the new evidence of [the victim's] admissions that the accusations were all lies '[was] not new'" and the witnesses who provided statements in support of the petition were "available" at the time of trial.  Doc. 1-1: 64.  The

petitioner then concludes that defense counsel "failed to conduct the investigation that would have obtained this evidence for trial," which the petitioner calls "a fatal failure." Doc. 1-1: 64.

a.     **The Ruling On Newly Discovered Evidence Is Entitled To Deference.**

A state court's denial of a motion for a new trial based on newly discovered evidence may only be reviewed in federal court for "the presence of error of constitutional magnitude." *Sawyer v. Mullaney*, 510 F.2d 1220, 1221 (1st Cir. 1975). Habeas relief will be "sparingly used." *Id. See also Grace v. Butterworth*, 586 F.2d 878, 881 (1st Cir. 1978) ("[W]here defendants have received a full and fair factual review in the state courts, the federal courts, in habeas proceedings, will not engage in second guessing.").

The trial court found that the evidence was not new. In doing so, it applied the appropriate rule. *See United States v. Conley*, 249 F.3d 38, 45 (1st Cir. 2001) ("A defendant seeking a new trial on the ground of newly discovered evidence must prove four factors to prevail: (1) the evidence must have been unknown or unavailable to the defendant at the time of trial; (2) the defendant must have been duly diligent in attempting to unearth it; (3) the newly discovered evidence must be material; and (4) the newly discovered evidence must be such that its emergence probably will result in an acquittal upon retrial." (Internal citations omitted) (Discussing Federal Rule of Criminal Procedure 33)).

Because the superior court applied the appropriate rule, this Court's review is deferential. The petitioner has not shown that the ruling on newly discovered evidence was an error, let alone an error of constitutional magnitude. He has only claimed that, while the witnesses were known to the petitioner at the time, and one even testified, they would now have unflattering things to say about the victim. He offers no analysis of their potential biases or the drawbacks of calling people who, as the superior court noted, had their own shortcomings.

The superior court also addressed the admissibility of the statements exclusively under the New Hampshire Rules of Evidence.  Exh. B: 6.  As such, this ruling is unreviewable. *Perruquet*, 390 F.3d at 511-12.  The petitioner has not shown that his claim entitles him to seek habeas corpus relief by filing an otherwise untimely petition.

> **b.**     **The Failure To Investigate Claim Is Waived And Unexhausted.**

The petitioner contends that the superior court "identified another of [trial counsel's] substandard performance.  Doc. 1-1: 64.  The petitioner then argues that the superior court never addressed this claim for purposes of the *Strickland* test.  Doc. 1-1: 65.

With respect to the first contention, the superior court did nothing of the sort.  It considered the petitioner's claim that the evidence was newly discovered and rejected it.  It made no comment on counsel's diligence in pursuing this evidence.

With respect to the second claim, this is true. The superior court did not consider the alleged failure to investigate because that claim was not raised as a basis for ineffective assistance of counsel in the superior court.  The failure to conduct discovery section in the petition addressed only trial counsel's failure to interview the victim.  State Pet.: 48-49.  The petitioner made no ineffective assistance of counsel claim with respect to this alleged failure to investigate.  As a result, the claim is both waived and unexhausted.

It is waived because, under New Hampshire law, issues that were not preserved with a contemporaneous objection in the proceeding below are waived.  *See State v. Wong*, 138 N.H. 56, 66, 635 A.2d 470, 476-77 (1993); *State v. McAdams*, 134 N.H. 445, 446-47, 594 A.2d 1273, 1273-74 (1991).  Further, issues that are not presented in the notice of appeal, presented in the notice of appeal but not briefed, or not adequately briefed on appeal are all deemed waived.  *See State v. Ayer*, 150 N.H. 14, 34, 834 A.2d 277, 296 (2003); *State v. Blackmer*, 149 N.H. 47, 49,

816 A.2d 1014, 1016 (2003).   In this case, the petitioner did not raise this claim of ineffective assistance of counsel in his petition and it is waived.

It is also unexhausted.  Exhaustion requires the petitioner to present the same operative facts and legal theory to the state court.  *Duncan v. Henry*, 513 U.S. 364, 370 n.1  (1995); *Picard*, 404 U.S. at 275; *see also Jackson v. Coalter*, 337 F.3d 74, 86 (1st Cir. 2003) (same factual and legal underpinnings of the claim); *Scarpa v.  Dubois*, 38 F.3d 1, 6 (1st Cir. 1994); *Domaingue v. Butterworth*, 641 F.2d 8, 12 (1st Cir. 1981); *Barbe v. McBride*, 521 F.3d 443, 456 n. 19 (4th Cir. 2008); *Ries v. Quarterman*, 522 F.3d 517, 523 (5th Cir. 2008); *Davis v. Silva*, 511 F.3d 1005, 1009 (9th Cir. 2008); *Lieberman v. Thomas*, 505 F.3d 665, 670 (7th Cir. 2007).   The exhaustion requirement is not met if the petitioner presents new legal theories or new factual allegations in federal court that transform his claim or cast it in a significantly different light." *Gagne v. Fair*, 835 F.2d 6, 9 (1st Cir. 1987) (internal citation and quotation omitted); *see also Carillo v. Brown*, 807 F.2d 1094, 1099 (1st Cir. 1986); T*urner v. Fair*, 617 F.2d 7, 11-12  (1st Cir. 1980) (if a claim has undergone a material alteration between the state court filing and the federal filing, it has not been fairly presented to the state courts).

As a result, in addition to the untimeliness of the petition, this part of the petition should be dismissed as both waived and unexhausted.

**5.     The "Newly Discovered Evidence" Is Not A Basis For Habeas Corpus Relief.**

Finally, in order to fully present its case against a ruling that the petition is timely, the respondent will turn to the "newly discovered evidence."

The petitioner's "newly discovered evidence" is comprised of letters and interviews. As noted above, the superior court found that this evidence was not new and that much of the

evidence would be inadmissible.  Exh. B.  The superior court's ruling is entitled to deference by this Court and, as an evidentiary ruling, is unreviewable, as discussed in further detail above.

But even if it were not, the petitioner has not satisfied his burden in demonstrating that he is entitled to federal habeas corpus relief.  This is for several reasons.

First, under federal law, statements and affidavits are not generally persuasive.  *Cf. Herrera*, 506 U.S. at 417 ("[M]otions based solely upon affidavits are disfavored because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations.").  Many of the statements are not even signed by the person being interviewed.  *See, e.g.,* Doc. 1-4; Doc. 1-8; Doc. 1-19.  The petitioner has done nothing to assure any indicia of reliability in them.

Further, although these interviews and written statements appear to suggest that the victim in this case has recanted, there is nothing from the victim himself that corroborates these statements of his untruthfulness.  Even if the victim had recanted, under federal law, it is "well established that recantations are generally viewed with considerable skepticism." *United States* v. *Carbone*, 880 F.2d 1500, 1502 (1st Cir. 1989).  *See also United States v. Coleman*, 460 F.2d 1038, 1040 (8th Cir. 1972) (*per curiam*) ("Motions for new trial based upon the alleged recantation of a material witness should be viewed with disfavor.")  Recantations that are inconsistent with other trial testimony, when the original testimony was consistent, are particularly unreliable.  *Allen v. Woodford*, 395 F.3d 979, 994 (9th Cir. 2005).

The statements themselves are of dubious reliability.  For example, in Debra Collett's statement, Doc. 1-6,, she complains that detectives "bullied her," treating the petitioner with "verbalized animosity,"  Doc. 1-6: 3.  When Collett testified at the petitioner's trial, however, she made no reference to bullying or verbal animosity.  Since she testified under oath, at a time

closer in time to the victim's disclosure, that testimony should be credited.  These supposed

recollections made years later should not carry the same weight as her sworn testimony.

Charles Glenn's statement was not credited by the superior court.  Exh. B: 4 n.1.  This is

because Glenn recanted the entire statement that he provided to James Abbott, the petitioner's

investigator.  *See* Doc. 1-5: 1; Doc. 1-7: 1.

The letter in which Glenn recanted, stating that Ghedoni had been paid by the

investigator and that he himself had lied to secure Abbott's help, apparently prompted a re-

interview of convicted felon Ghedoni, who then discredited her son, writing:

> Back in November December of last year, Charles [Glenn] wanted me to get Mr.
> Abbott to get him an attorney to handle his appeal. We tried but it didn't happen.
> Charles was very mad. Charles blamed Mr. Abbott and myself saying we didn't
> do enough. Charles became so angry that he was threatening Mr. Abbott and
> myself. Charles said he was going to do something about it. I stopped contacting
> my son in jail because of the threats including that he would kill me. A couple of
> days ago I learned from a different private investigator that my son had filed a
> letter saying that I got money for giving false statements about Tom and had sex
> with Mr. Abbott. I was loaned money from Mr. Abbott, which I paid back. I never
> had sex with Mr. Abbott who has always been a gentleman. The information that I
> gave about [the victim] was truthful and I standby it.

Doc. 1-9: 1.  The respondent directs this Court to these statements for three reasons.

The first is that it should clearly put no reliance on the statements of either Glenn or

Ghedoni.  Glenn recanted his statement and Ghedoni was interviewed by a man who had been so

kind to loan her money. Neither Ghedoni nor the investigator saw fit to mention this in any of

Ghedoni's previous statements.  Doc. 1-2; Doc. 1-10; Doc. 1-12; Doc. 1-19; Doc. 1-30.  Nor did

the investigator see fit to mention it in his affidavit.  *See* Doc. 1-16: 3 (summary of the

investigator's interviews of Ghedoni).

Second, while Abbott's loan to Ghedoni was clearly relevant to her motive in making the

statements, the information was not presented to the superior court.  It was not until the *State*

filed Glenn's letter with the superior court that the court was even aware that Glenn had recanted.  Exh. B: 4 n.1.  Ghedoni later confirmed the financial arrangement with Abbott, but the omission of it at the time the petition was filed cannot have been inadvertent.  Whether the petitioner knew of it is immaterial; the person investigating and the person providing the statement knew and did not disclose it.

The third reason is that Ghedoni is a convicted felon, and is divorced from the victim and has every reason to harbor a grudge and attempt to discredit him.  Her conviction would be admissible at trial and, therefore, is relevant in reviewing her statements.  As to bias, in one of her statements, for example, she stated that she came home to her house to find the victim in bed "with a blood relative."  Doc. 1-30: 2.

The timing is equally suspect.  Ghedoni did not come forth with these statements immediately, contacting the authorities with her concerns.  Instead, she waited until a man, who she acknowledged had loaned her money, interviewed her.  And he not only interviewed her; he interviewed her on six different occasions between April 23, 2008 and August 13, 2009.  Doc. 1-16: 13.

The petitioner wishes this Court to second-guess the testimony of witnesses given under oath at his trial, but he does not point out to this Court that his "newly discovered evidence" is even more problematic than the inconsistencies addressed at trial in the victim's testimony.

Finally, as the superior court observed, many of the newly discovered statements would be inadmissible under New Hampshire laws. Exh. B: 6.  The former stepdaughters would not be allowed to testify that the victim was a "creep."  Ghedoni would not be allowed to testify that she caught the victim in bed with another person, particularly as this event took place after the trial.

## IV.     CONCLUSION

WHEREFORE, the respondent respectfully requests that the petition for a writ of habeas corpus be dismissed as untimely without a hearing.

Respectfully Submitted,

Warden, New Hampshire State Prison, Respondent.

By his attorneys,

Michael A. Delaney
Attorney General

*/s/ Elizabeth C. Woodcock*
Elizabeth C. Woodcock
Bar Number:  18837
Assistant Attorney General
Criminal Justice Bureau
33 Capitol Street
Concord, NH  03301-6397
Phone: (603) 271-3671
July 30, 2014                                        Elizabeth.Woodcock@doj.nh.gov

36

## **CERTIFICATE OF SERVICE**

I, the undersigned, do hereby certify that I have served the petitioner, who is represented by

Robert Rosenthal, Esq.
Cathy J. Green, Esq.

through this Court's electronic filing system.

*/s/ Elizabeth C. Woodcock*
Elizabeth C. Woodcock