# THE STATE OF NEW HAMPSHIRE

**MERRIMACK, SS.**                                                                                        **SUPERIOR COURT**

Gordon MacRae

v.

Richard Gerry, Warden
New Hampshire State Prison

No. 12-CV-279

### ORDER

The petitioner, Gordon MacRae, seeks a writ of *habeas corpus*. He asks the court to vacate his 1994 convictions for felonious sexual assault and aggravated felonious sexual assault and grant a new trial. The petitioner maintains that his continued incarceration based on these convictions is illegal because trial counsel was ineffective and newly discovered evidence supports his innocence. At a status conference on January 15, 2013, the parties agreed to bifurcate the claim of ineffective assistance and the claim of newly discovered evidence. Consequently, this order will be limited to an analysis of the petitioner's claim based on ineffective assistance of counsel. The record provided is extensive and, after review, the court has determined that it is sufficient to determine whether the petitioner did not receive effective assistance of counsel. Thus, the court need not hold a hearing. *See Grote v. Powell*, 132 N.H. 96, 99–100 (1989). Because the petitioner has failed to meet his burden of demonstrating that his counsel's actions amounted to ineffective assistance, his petition for writ of *habeas corpus* is DENIED on that ground and the respondent's motion to dismiss the ineffective assistance claim is GRANTED.

- 2 -

## History

On April 30, 1993, the grand jury handed down indictments accusing the petitioner, a Catholic priest, of two counts of felonious sexual assault (class B felony) and four counts of aggravated felonious sexual assault (class A felony). The charges stemmed from the allegations of ███████, who met MacRae in the early 1980s when ███ mother turned to her church and to him for help with ███ alcoholism and legal trouble.

For his defense, MacRae retained Attorney Ron Koch as lead counsel. Mr. Koch practiced in New Mexico. Attorney J.R. Davis was secondary local New Hampshire counsel. Mr. Davis "was retained primarily so that Ron [Koch] could appear in New Hampshire" and "to assist on local procedural issues and questions and/or to conduct New Hampshire research when requested by [Koch] and/or [MacRae]." Respondent's Memorandum of Law for Denial and Dismissal of Petition ("Objection"), Document Supplement, Tab 9a ("Davis Affidavit"), at 131. Mr. Davis only appeared at trial because, at the close of jury selection, the court made it clear that he was expected to appear. *Id.*

The jury trial began on September 12, 1994 and lasted for ten days. MacRae was tried on all four of the class A felony charges and one of the class B charges. On September 23, 1994, the jury returned verdicts of guilty on all counts. On November 14, 1994, the court sentenced MacRae to a prison term of 33.5 to 67 years. Presently, he remains incarcerated.

On September 25, 1995, MacRae filed a direct appeal with the New Hampshire Supreme Court. The issues on appeal included: (1) whether the state impermissibly used the testimony of its expert witness, Doctor Fleischer, to prove that ███ allegations were true; (2) whether the trial court erred in precluding the defense from cross-examining ███ with his juvenile convictions; and (3) whether the trial court erred in instructing the jury to disregard certain of ███

answers to defense questions. The court affirmed. *State v. MacRae*, 141 N.H. 106 (1996). The instant petition followed.

**Law**

In his petition for *habeas corpus* relief, MacRae asserts that his convictions should be vacated and that he is entitled to a new trial because his trial counsel provided ineffective assistance in violation of both his state and federal constitutional rights. "The State and Federal Constitutions guarantee a criminal defendant reasonably competent assistance of counsel." *State v. Croft*, 145 N.H. 90, 91 (2000) (citations omitted). "The standard for determining whether counsel's performance is constitutionally deficient is the same under both the State and Federal Constitutions." *Id.* (citations omitted). Thus, competency of trial counsel's performance will be evaluated under the State Constitution and Federal case law will be cited for guidance only. *Id.*

In order to succeed on a claim of ineffective assistance of counsel, MacRae "must first show that counsel's representation was constitutionally deficient and, second, that counsel's deficient performance actually prejudiced the outcome of the case." *State v. Kepple*, 155 N.H. 267, 269-70 (2007). Where the petitioner has failed to meet either prong of this test, the court need not consider the other prong. *Id.* at 270.

To meet his burden under the first prong, MacRae must prove "that counsel's representation fell below an objective standard of reasonableness." *State v. Hall*, 160 N.H. 581, 584 (2010) (quotations and citations omitted). "The reasonableness of counsel's conduct [is] based upon the facts and circumstances of [the] particular case, viewed from the time of that conduct." *Id.* (citations omitted). When considering the first prong of an ineffective assistance of counsel claim:

> Judicial scrutiny of counsel's performance must be highly deferential. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the

- 4 -

> evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Id.*, quoting *State v. Whittaker*, 158 N.H. 762, 769 (2009).

To meet his burden under the second prong of the test, MacRae must demonstrate "that there is a reasonable probability that the result of the proceeding would have been different" if counsel did not take the complained of action. *State v. Sanchez*, 140 N.H. 162, 163 (1995) (citation omitted). In examining the petitioner's claim for prejudice, the court should look to "the totality of the evidence before the judge or jury" at the time of trial. *Avery v. Cunningham*, 131 N.H. 138, 149 (1988). Where the petitioner "is unable to demonstrate such prejudice, [the court] need not even decide whether counsel's performance was deficient." *Sanchez*, 140 N.H. at 163 (citation omitted).

**Analysis**

MacRae's petition specifies four claims of ineffective assistance. Specifically, MacRae asserts that counsel's assistance was ineffective as follows: (1) in the opening statement, counsel "opened the door" to uncharged acts testimony after arguing successfully for the inadmissibility of the evidence during pretrial motions; (2) counsel gave the state certain documents containing MacRae's annotations and thoughts that ultimately amounted to the defense "giving away" its trial strategy; (3) counsel failed to object to the admission of expert testimony elicited through a lay witness; and (4) Attorney Koch improperly permitted secondary counsel Davis to conduct an informal pretrial interview of ▇▇▇. The court will address each claim in turn.

### Opening the Door to Otherwise Inadmissible Evidence

The petitioner first asserts that trial counsel was ineffective when, during his opening statement, he "opened the door" to uncharged acts evidence after he had successfully argued its

- 5 -

inadmissibility pretrial under New Hampshire Rule of Evidence 404(b). Specifically, the defense sought to exclude testimony of three uncharged acts that would have come in through ▇ Trial Transcript ("TT"), 2:28–41.

The first uncharged act occurred when ▇ was delivering a newspaper to the rectory. ▇ testified that he:

> Had, uhm, a donut and something to drink and went into the other front room of the rectory ... as we were walking down the hallway, MacRae was behind me at first and came and slowly pushed me towards—not pushed me but moved his body so I went towards the wall and just before we got to the door he put— pushed me up against the wall. I had my paper bag in front of me and he pushed his weight up against me and put his arm up under my throat.
>
> He grabbed—took his hand and grabbed my crotch area and was grinding his body up against my side ... I tried to move away and he pushed his weight up against me and was grinding his lower half against my body....

TT, 2:28–32. As to the second uncharged act, ▇ testified that MacRae offered to drop his brother off at the airport and ▇ went along for the ride. On the way home to New Hampshire, ▇ said:

> It was night time and late and I fell asleep in the front of the car and when I woke up, uhm, Gordon MacRae had his hand on my pants and was fondling me.

TT, 2:38. Finally, as to the third uncharged act, ▇ testified that he was in the car again with MacRae, this time "going to get some food." ▇ testified:

> [O]n the way there, he again pinned me—he fondled me through my pants.... He just took his arm and pushed like that and then grabbed at my crotch area with his hand and was feeling through my pants.

TT, 2:40.

Additionally, several witnesses corroborated portions of ▇ testimony about the uncharged acts to the extent that ▇ told them about the acts or to the extent that they had involvement leading up to the events that gave MacRae the opportunity to commit such acts: De-

tective James McLaughlin (TT, 7:39–43); Patricia Grover, ▮ adoptive mother (TT, 6:60–62); and Jon Grover, ▮ brother (TT, 7:20–21).

After securing the court's favorable evidentiary ruling excluding ▮ testimony about the three uncharged acts, Koch in his opening characterized the first charged incident of sexual abuse as occurring "out of the clear blue." TT, 1:59. Following Koch's opening, the state objected. It argued that "[the defense has] a misleading advantage by making that representation to the Court that it came out of the blue because in reality there was prior contact between Mr. MacRae and ▮." *Id.* at 62. The court agreed with the state, ruling that testimony of the uncharged acts, though previously ruled inadmissible, would be allowed because Koch's "clear blue comments magnified the issue of Gordon MacRae's opportunity or chance to commit the charged acts to such an extent that it would be an injustice to prevent the state from introducing those acts." TT, 2:4.

The petitioner asserts that Attorney Koch's opening, which caused the admission of otherwise inadmissible evidence, could "**never** [be] within any objective standard of reasonableness." Petitioner's Memorandum of Law in Support of a Petition for Writ of Habeas Corpus ("Petition"), 42 (emphasis added) (quotations omitted). Further, the petitioner asserts that the "prejudice of introducing critical and dramatic prosecution evidence that the state could not obtain for itself is obvious." Petition, 44. The petitioner relies on four points of prejudice that he submits create a reasonable probability of a different trial outcome had the uncharged acts not been admitted: (1) "The uncharged acts were a feature of the trial" and were testified to by numerous witnesses; (2) the indictment did not give notice of times, dates, weeks, or months for the charged acts and evidence of the uncharged acts only added to the inability to mount a defense; (3) the uncharged acts "rehabilitated important flaws in ▮ stories;" and (4) right from the

-7-

beginning, defense counsel gave the jury the impression that he was misleading them or leaving out important facts, undermining his own trustworthiness and "making it that much more difficult to have the jury view the defense as credible." Petition, 45.

While the court disagrees with the petitioner's assertion that allowing the admission of otherwise inadmissible evidence could "never" be within an objective standard of reasonableness, it will nevertheless assume without deciding that Attorney Koch's "out of the clear blue" statement was not part of a calculated risk designed to further a trial strategy. While Koch's argumentative response to the state's objection to his opening statement can be construed as a vigorous effort to retain an advantage he was willing to sacrifice, it could also be construed as inconsistent with the respondent's contention that his "clear blue" comment was purposeful and part of an overall trial strategy to undermine ▋ credibility. *See* TT 1:62–64. Additionally, Attorney Davis explained that "[h]aving successfully excluded the 404(b) evidence pre-trial, [Koch] and I both wanted to keep it out." Davis Affidavit, 134. Although it may have been part of the defense team's overall strategy to undermine ▋ credibility, with respect to the excluded 404(b) evidence, "[Koch] wanted to get as close to the line as he possibly could without crossing it." *Id.*

Having assumed that Koch inadvertently opened the door, the court moves on to the second prong of the analysis—whether there is a reasonable probability that the results of the trial would have been different. The petitioner has not sustained this burden. The totality of the record evidence does not support the petitioner's claim that Koch's "opening the door" actually prejudiced the outcome of the case.

From the outset, it is clear from the record that the defense strategy was to attack ▋ credibility and call into question his motivations for the allegations he made against

- 8 -

MacRae. Davis Affidavit, 134. This was rationally the only strategy available to the defense. As the respondent explains:

> An alibi defense would have been difficult in light of [the] wide time frame during which the assaults were alleged to have occurred.... Had Koch abandoned his pointed attacks on TG's credibility ... [he] would have been left with the claims of delayed reporting, inconsistencies between the police statements and trial testimony, and the lawsuit against the Church. But Dr. Fleischer's testimony tended to reduce the impact of ▓ delayed reporting and the inconsistencies.

Objection, 28–29. Additionally, Koch could not put MacRae on the stand. If MacRae did testify, the court made it clear that other previously excluded 404(b) evidence involving other victims and probation violations would be admissible because it would be probative of MacRae's credibility. TT, 1:10. With these circumstances in mind, Koch's only viable and reasonable theory of defense was to attack the credibility of ▓ in a directed and specific way—with the "precision of a laser surgeon." Document Supplement, Tab 9b, 141.

The trial record supports this characterization of the defense strategy. At the beginning of his opening, Koch told the jury: "You're going to have to judge the motivation and credibility of ▓ in this case based upon what he says from that witness stand...." TT, 1:46. When describing ▓ Koch told the jury:

> ▓ not only had a severe alcohol problem ... he had a severe drug problem. I'm talking marijuana, cocaine, amphetamines, crack cocaine, hashish, and other hallucinogenics.... His alcohol problem and his drug abuse problem was so severe that his family could hardly tolerate him, even as a young man.... ▓ was abusive physically and verbally, even from the time he was a very young man to the point that his family couldn't deal with him. They were afraid of him.

TT, 1:52–53. Koch went on to tell the jury that '▓ has a felony conviction and his felony conviction is that he essentially aided and abetted or was an accomplice to a burglary....'

TT, 1:55–56. With respect to ▓ accusations, Koch told the jury:

> [A]s ▓ begins to unveil his version of events, he is talked to on many different occasions by many different people.... [A]s he is speaking to them and

giving statements at different points in time in the scenario of events, there are changes that take place in the version of events.

TT, 1:59. Based on the totality of the record, it is clear the defense strategy, and most prominent issue in the trial, was ▇ credibility.

Koch could not have caused any actual prejudice to the defense when he "opened the door" to the uncharged acts testimony. Because undermining ▇ credibility was Koch's best rational option as a trial strategy, it was inevitable that Koch would open the door to the uncharged acts in his attempt to attack ▇ stories precisely and successfully. As part of the defense tactic to diminish ▇ credibility, a dominant theme recurred—▇ was introduced to MacRae for legal and mental health help, ▇ would not have submitted to sexual abuse in such a distraught state, and he would not have continuously returned for repeated abuse. While Koch may have wanted to "get as close to the line as he possibly could without crossing it," this defense tactic would almost certainly allow for the admission of the uncharged acts.

Despite the inevitability of triggering the admission of the uncharged acts evidence, this tactic was reasonable. Indeed, Koch's pretrial preparation anticipated this turn of events. He was prepared to execute effective cross-examinations based on the uncharged acts testimony. For example, during his cross-examination of ▇ Koch elicited that, as to the first uncharged act, MacRae invited him into the rectory for juice and doughnuts, just like another priest, Father Horan had done "on many occasions." TT, 3:121–122. As respondent points out, however, Koch elicited through Father Horan that the priests did not invite individual children into the rectory for doughnuts. TT, 8:50. Additionally, as to the first incident, Koch elicited from ▇ that he told different versions of the incident to Detective James McLaughlin than he told to the jury during his direct examination. TT, 4:15. Further, Koch spent parts of his cross-examination of ▇ eliciting testimony that ▇ did not recall how old he was, what time of year it was, or

- 10 -

any conversation with MacRae surrounding the uncharged acts incidents. TT, 4:10–14:66, 71. Based on the record, therefore, Koch was able to continue to undermine ▮ testimony and maintain his overall defense strategy despite the admission of the uncharged acts.

Finally, just before ▮ testified to the uncharged acts, the court provided the jury with a limiting instruction. The court instructed the jury that the only permissible use of the evidence, if credible, was to find that MacRae had the opportunity to commit the alleged acts. The court instructed the jury that it would not be permissible for the jury to use the testimony of the uncharged acts to find that MacRae committed the charged acts. TT, 2:28–29. These instructions support the respondent's argument that Koch's actions during opening did not result in actual prejudice to the outcome of the case.

Based on the totality of these circumstances, the court concludes that Attorney Koch's "out of the clear blue" statement, which "opened the door" to otherwise inadmissible character evidence, did not actually prejudice the outcome of the case. The petitioner has failed to persuade the court that there is a reasonable probability that the result would have been different if Koch did not "open the door" to such evidence. Consequently, Koch's comments during his opening statement did not amount to constitutionally defective assistance of counsel.

### Annotated Discovery

The petitioner next asserts that Attorney Koch did not provide competent assistance of counsel when he provided the state with a copy of certain documents from state discovery that MacRae had annotated with his thoughts and impressions. The petitioner contends that this amounted to Koch "giving away the defense theory and strategies." According to the petitioner, "[d]isclosing the defense case to the state is so far outside any standard of reasonableness … that assessments of reasonableness or strategy are all but irrelevant." Petition, 46. The court disagrees.

Attorney Davis gave several explanations as to why providing the state with copies of its own discovery with MacRae's annotations was part of the defense strategy. The reasons included: (1) "formulating and substantiating an alibi defense;" (2) setting up an argument for fundamental unfairness in defending allegations from unknown dates from ten years prior; (3) "setting things up for a bill of particulars from the state;" and (4) due to their own questioning regarding whether or not ▓ would testify "when push cam[e] to shove," the disclosure was in part a way to force the state to question their own witness or motivate ▓ to not assist the state. Davis Affidavit, 135. Indeed, Davis explains that there were actually two versions of the same documents that MacRae annotated—one, that did "not contain any damaging information," that the defense would disclose to the state and a second one that the defense would keep for its own purposes. *Id.*

Additionally, as respondent argues, the annotations from MacRae served purposes at trial nearly akin to MacRae testifying himself. Defense counsel was able to use the annotated discovery to keep out damaging letters between MacRae and Detective McLaughlin. In the letters, McLaughlin posed as ▓ brother and the state asserted that the letters were admissions of misconduct and showed consciousness of guilt. After Koch read the court MacRae's own explanation from his annotations, the letters were ruled inadmissible. Moreover, Koch later elicited from Detective McLaughlin that, before trial, he reviewed MacRae's annotations and was aware of some of the inconsistencies in ▓ allegations.

Based on the record, and mindful of the deference that must be given to Koch's actions in providing MacRae's annotated discovery to the state, the court finds and rules that it was part of a sound trial strategy. Therefore, the petitioner has failed to sustain his burden of demonstrating that this conduct amounted to ineffective assistance of counsel. Because Koch acted within a

- 12 -

standard of objective reasonableness, the actual prejudice prong of the ineffective assistance analysis need not be considered.

### Expert testimony of Detective McLaughlin

In his third argument, the petitioner contends that Koch provided ineffective assistance when he failed to object to expert testimony elicited through a lay witness, Detective McLaughlin. At trial, the state asked the court to qualify Detective McLaughlin as an expert witness in "the process in which victims disclose the sexual abuse, mainly looking at the inconsistencies ... that this is more a process rather than an event." TT, 7:53. Although the court ultimately denied the state's request, it inquired of Koch:

> We've just had Detective McLaughlin testify about all these hundreds of witnesses that he's interviewed. What would be your objection if the State were to ask [Detective McLaughlin] if there were ever any inconsistencies in the recollections of these witnesses? And would you consider that answer to be the answer of an expert? Standing here without your argument, I don't think that's the answer of an expert. I think that's an answer, that's direct evidence. The question could be asked. How would you respond to that?

TT, 7:94. Attorney Koch agreed with the court. Eventually, Detective McLaughlin testified as follows:

> A.   Most of the adult victims who are victimized as children sexually, when they finally come to terms and are able to disclose that information, especially to an authority, will basically give you a rough outline of what happened to them, what occurred over a length of time. And then on subsequent interviews, they will come up with additional facts about their victimization.
>
> Q.   Is there a term 'confabulation that you're familiar with?
>
> A.   Confabulation is sometimes the mind will take incidents of abuse that occurred years ago, and let's say three incidents happen during a given day. Their mind may believe that those occurred on three separate days, or vice versa, that three separate day's events happened all in one day, and that can happen.
>
> Q.   So if I understand, your disclosure sometimes comes in pieces rather than in its totality?
>
> A.   Yes, typically.

- 13 -

TT, 7:97–98. The petitioner maintains that this was impermissible expert testimony because it was elicited through a lay witness.

In support of this argument, the petitioner relies on *State v. Gonzalez*, 150 N.H. 74, 78 (2003). *Gonzalez* holds that testimony regarding victim denials or recantations in sexual assault cases and whether they are unusual or not is expert testimony; thus, it would be impermissible for a lay witness to testify as such. The respondent contends, on the other hand, that this was not the law when the case was tried in 1994; therefore, it has no bearing on the determination of whether Koch acted with a reasonable degree of competency. In his reply, the petitioner relies on *State v. Cressey*, 137 N.H. 402 (1993)—a case that was decided before the 1994 trial. The court is not persuaded. *Cressey* holds that a psychological expert could not testify that the symptoms or behaviors of a particular complaining witness indicate that the complaining witness was sexually abused. This is because the science is not sufficiently reliable. *Cressey*, 137 N.H. at 407. McLaughlin's testimony does not fall into this category; rather, he testified generally that victims of sexual abuse often forget details of incidents or take time to come forward with allegations of abuse, often needing more than one interview to realize fully the extent of their abuse. The sexual abuse is already acknowledged. McLaughlin did not testify that interviewees who have trouble remembering details or interview over the course of several meetings must be victims of abuse. Indeed, *Cressey* explicitly held that such evidence could be admitted. *Id.* at 411-412. The issue here, however, is not whether such general evidence was admissible, but whether it could have come in through McLaughlin in 1994.

While the court agrees with the respondent that *Gonzalez* would not be applicable to a 1994 case, the foundation for the law as decided in *Gonzalez* was already in place at that time. Generally, even in 1994, to determine whether a witness is offering expert testimony, the court

must consider "whether or not the witness, by either study or experience, has knowledge on the subject-matter of his testimony so superior to that of men in general concerning it that his views will probably assist the trier of fact." *McMullin v. Downing*, 135 N.H. 675, 679 (1992). By way of example, in *Gelinas v. Metropolitan Property & Liability Ins. Co.*, 131 N.H. 154, 167 (1988), two lawyers proposed as witnesses to give testimony on their first-hand knowledge of events surrounding a negotiation and a trial were deemed to be lay witnesses because they were not offering opinions or conclusions from their observations; rather, the lawyers were solely testifying factually.

Unlike the lawyers in *Gelinas*, Detective McLaughlin testified to a conclusion he drew about sexual assault victims after many interviews with different victims over a period of time. These numerous interviews and his conclusion that sexual assault victims often do not remember parts of incidents or reveal details through a process of interviews are plainly part of the experience and knowledge he has as a detective. This knowledge is also plainly outside that of the average juror. Further, other jurisdictions had already held in 1994 that a police officer's experience and the conclusions drawn from it constitute expert testimony. *See Seal v. Miller*, 605 So.2d 240, 244 (Miss. 1992) (police officer's testimony based on experience investigating accidents is not lay testimony). Under these circumstances, an objection to the court's suggestion that McLaughlin's testimony was admissible even though he was a lay witness could have and should have been made. This court understands that the trial court, in its suggestion, implied that it would rule the testimony admissible despite any objection. TT, 7:94. This does not change the analysis. To provide effective assistance of counsel, the objection should have been made.

Having determined that Koch's failure to object fell below an objective standard of reasonableness, the court must now consider whether the admission of McLaughlin's testimony re-

- 15 -

sulted in any actual prejudice to the outcome of the case. The petitioner has not sustained his burden of showing prejudice. First, Koch effectively cross-examined McLaughlin on the discrepancies in ▮ testimony and McLaughlin's failures in investigation: *e.g.*, ▮ testified the assault occurred in the southeast office, but MacRae only used the southwest office, TT, 7:112–113; McLaughlin's failure to interview Father Dupuis or inquire of ▮ whether any assaults took place in the southwest office, TT, 7:118; failure to determine whether the doors in the rectory locked, TT, 7:131; and eliciting from McLaughlin that his investigation is ongoing and at any time he can update or supplement his report, TT, 7:118. The cross-examination would have worked to further the defense strategy of undermining ▮ credibility and would also have undermined McLaughlin's direct testimony.

Additionally, the jury heard the same type of testimony from a more credible source. The state's expert, Dr. Leonard Fleischer, testified even more in depth and more specifically than Detective McLaughlin about the length of time it usually takes sexual abuse victims to disclose their abuse (TT, 7:177–175) and how victims tend to forget details when it comes to the actual disclosure (TT, 7:184–187). Moreover, in the court's final jury instructions, it referred only to Dr. Fleischer when it instructed on expert testimony. TT, 9:81; 89–90. Under these circumstances, the petitioner cannot meet his burden of demonstrating that Koch's failure to object to the expert testimony elicited from Detective McLaughlin resulted in any actual prejudice to the outcome of the case. Consequently, Koch's action was not constitutionally ineffective.

### Assignment of Interview to local Counsel

The petitioner's final contention is that Koch provided ineffective assistance of counsel when he permitted secondary counsel Davis to conduct an informal, pretrial interview of ▮. According to the petitioner, if Koch (who the petitioner claims had been egregiously ineffective in his other conduct) had conducted a pretrial deposition of ▮, he would have been able "to

pin down ▇ and force him to commit to a particular version" of events. Petition, 48. Further, the petitioner maintains that if Koch conducted a pretrial deposition, he "would have ferreted out critical cross-examination material and prior statements with which to impeach ▇ at trial." *Id.* Rather than gain these advantages, Koch allowed Davis to conduct an informal interview. The petitioner asserts that Davis was unprepared for the interview and did not focus appropriately on discrepancies in ▇ stories but, instead, focused on background information. The court is not persuaded.

First, as the respondent asserts, Koch could not have conducted a pretrial deposition of ▇. The trial court specifically limited defense contact with ▇ to an informal interview and not a deposition. *See* Motion Hearing Transcript, 36–39. Moreover, as the respondent explains, if Koch conducted a pretrial deposition of ▇, the state would have been able to use the deposition to lock ▇ into trial testimony. Koch's decision to conduct an informal interview "preserved his ability to challenge [▇] inconsistencies at trial and deprived the State of the use of a deposition as a source of prior consistent statements." Objection, 35–36.

Additionally, Koch explained in a letter to Davis that:

> I also want to take my statement from ▇. I may utilize an attorney or investigator, other than myself to do the interview as I don't want Mr. ▇ to become acquainted with me and my style. I don't want him to feel that I'm a familiar figure when we go to court.

Document Supplement, Tab 9b, at 141. Although Davis admits "that [he] did not feel adequately prepared to conduct the interview," he did state that, to prepare, he "reviewed the discovery extensively." Davis Affidavit, 137. Importantly, "[n]either [Koch] nor [MacRae] shared [Davis'] concern" that he was not adequately prepared. *Id.* Under these circumstances, Koch's decision to let Davis conduct the informal pretrial interview of ▇ deserves deference as being within

sound trial strategy. The action did not fall below an objective standard of reasonableness and, therefore, did not amount to ineffective assistance of counsel.

## Conclusion

Based on its review of the record provided, counsel's arguments, and the foregoing analysis, the court finds and rules that the petitioner has not sustained his burden of demonstrating that any of the specified actions of Attorney Koch amounted to ineffective assistance of counsel. Accordingly, the petitioner's request for *habeas* relief based on ineffective assistance of counsel is DENIED and the respondent's motion to dismiss the petition as to ineffective assistance of counsel is GRANTED.

**So ORDERED.**

Date: March 15, 2013

LARRY M. SMUKLER
PRESIDING JUSTICE